IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

WILLIAM M. LEMMON,                )
                                  )
                Plaintiff,        )
                                  )
        v.                        ) Case No.
                                  ) 04-3461-CV-S-REL-SSA
JO ANNE BARNHART,                 )
Commissioner of Social            )
Security,                         )
                                  )
                Defendant.        )

## ORDER DENYING PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff William M. Lemmon seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for benefits under Titles II and XVI
of the Social Security Act. Plaintiff argues that (1) the
ALJ did not properly evaluate plaintiff's mental impairment;
(2) the ALJ did not properly evaluate plaintiff's congestive
heart failure;[1] (3) the ALJ erred in finding that
plaintiff's combination of impairments do not equal a listed
impairment; (4) the ALJ did not properly evaluate
plaintiff's credibility; (5) the ALJ did not properly

---

[1]Congestive heart failure is inadequacy of the heart so
that as a pump it fails to maintain the circulation of
blood, with the result that congestion and edema develop in
the tissues. Resulting clinical syndromes include shortness
of breath or nonpitting edema, enlarged tender liver,
engorged neck veins, and pulmonary rales in various
combinations. Steadman's Medical Dictionary.

evaluate the medical opinions of record; and (6) new and material evidence warrants remand.

I find that the ALJ did not err in evaluating plaintiff's mental impairment; did not err in evaluating plaintiff's congestive heart failure; did not err in finding plaintiff's combination of impairments failed to equal a listed impairment; properly evaluated the medical opinions in the record; and that the new evidence does not warrant a remand to the agency for further action. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

This suit involves two applications made under the Social Security Act. The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq. (Tr. 78-80). The second is an application for supplemental security income benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. (Tr. 726-29). Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent

as the Commissioner's final determination under section 205. Plaintiff's applications for benefits were denied on April 24, 2001 (Tr. 63-68, 730-35).

On August 13, 2003, following a hearing, an Administrative Law Judge ("ALJ") found plaintiff was not disabled (Tr. 14-29). On August 20, 2004, after consideration of additional evidence, the Appeals Council of the Social Security Administration denied plaintiff's request for review (Tr. 7-9, 731-829). Thus, the decision of the ALJ is the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in

3

opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or

4

mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

5

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

No = not disabled.
Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.  THE RECORD[2]

### A.    ADMINISTRATIVE RECORDS

The record contains the following administrative records:

### 1.    Earnings Statement

Plaintiff's earning statement shows the following income for the years 1968 through 1999:

---

[2]The facts are largely a matter of stipulation between the parties. *See* Document No. 20-1, Brief for Defendant, page 2.

6

| Year | Annual Earnings |
|------|-----------------|
| 1968 | $    527.00 |
| 1969 | 694.46 |
| 1970 | 2,161.64 |
| 1971 | 3,278.94 |
| 1972 | 3,424.49 |
| 1973 | 4,131.14 |
| 1974 | 8,105.21 |
| 1975 | 13,483.33 |
| 1976 | 14,198.87 |
| 1977 | 9,267.81 |
| 1978 | 9,998.71 |
| 1979 | 9,638.93 |
| 1980 | 16,776.85 |
| 1981 | 21,391.75 |
| 1982 | 31,341.70 |
| 1983 | 19,610.91 |
| 1984 | 0.00 |
| 1985 | 0.00 |
| 1986 | 26,662.44 |
| 1987 | 43,800.00 |
| 1988 | 2,117.60 |
| 1989 | 0.00 |

| 1990 | 0.00 |
| 1991 | 549.00 |
| 1992 | 2,327.00 |
| 1993 | 1,141.00 |
| 1994 | 7,858.76 |
| 1995 | 16,375.22 |
| 1996 | 5,446.42 |
| 1997 | 6,487.83 |
| 1998 | 23,144.78 |
| 1999 | 1,719.24 |

**2.    Third-Party Statements**

In an October 11, 2000, letter from Professor Knotts, Management Department, Southwest Missouri State University, the school reported providing the following accommodations to plaintiff: (1) proctored testing outside the usual classroom environment, (2) extended time (time and a half recommended) for testing, and (3) a minimum of 12 point font on all exams (Tr. 143).

On November 27, 2002, faculty from the Southwest Missouri State wrote a letter to plaintiff outlining a manner by which he could successful conclude his degree, but observing that "[b]ecause you have a history of making faculty members feel uncomfortable and requiring them to

8

spend a great deal of time dealing with issues you create, we hereby serve notice that if any technical writing faculty member feels uncomfortable or threatened by your behavior anywhere, or you are the least bit disruptive in any technical writing class, you will immediately be expelled from the Professional Writing program" and potentially suspended or expelled from the university (Tr. 151).

On June 17, 2003, plaintiff's lawyer submitted email correspondence to the ALJ dealing with plaintiff's termination from James River Basin Partnership for becoming too assertive with one of the directors (Tr. 152-56).

**3. Other Records**

Plaintiff worked in the automobile repair business from the early 1980s and through the 1990s (Tr. 105-12).

In his disability report, plaintiff alleged disability due to seizures; coronary artery disease; diabetes; edema; back, hand, elbow and left knee pain; depression; fatigue; fainting; and foot sores (Tr. 96).

**B.  *SUMMARY OF MEDICAL RECORDS***

According to medical records from St. John's Regional Medical Center, plaintiff was admitted to the Marion Center on a 96-hour involuntary hold on December 31, 1994, after police brought him to the hospital. He had complained of

9

severe depression and had discharged a gun near his head. It was noted that his blood alcohol level on admission was 165. He was discharged on January 4, 1995, in an improved condition (Tr. 430-435).

On January 14, 1995, plaintiff went to the emergency room and then to Cox North Adult Psychiatric Unit after slashing his wrists in an attempted suicide. He was being followed by James Bright, M.D., for treatment of major depressive disorder and ethanol dependency. His wrists were treated and he was instructed to continue his present care under Dr. Bright (Tr. 212-214). A discharge summary documents a discharge diagnosis of:

Axis I:      Major depressive disorder

Axis II:     Alcohol dependence

Axis III:    Probable sprain to the left knee

Axis IV:     Moderately severe external stress

Axis V:      GAF[3] of 25 to 30

(Tr. 210-211).

_____

[3]A Global Assessment of Functioning ("GAF") Scale of 25-30 indicates that behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in most areas.

It was noted that plaintiff quickly stabilized after admission. He agreed to go to Sigma House on discharge (Tr. 210).

A Cox Medical Centers-North diagnostic summary from Mark Carlson, M.D., dated January 14, 1995, documents that plaintiff had previously been admitted to the Marion Center for a suicide attempt. Plaintiff reported considerable problems with alcohol and admitted that he had given up alternative pleasures in order to concentrate on his drinking (Tr. 204-205). He was diagnosed with:

    Axis I:    Major Depressive Disorder, Severe Single
               Episode without Psychotic Features Alcohol
               Dependency

    Axis II:   Personality Disorder with Mixed Features

    Axis III:  Self Inflicted Incised Wound to the Left
               Upper Extremities

    Axis IV:   Moderately Severe External Stress

    Axis V:    GAF 25 on Admission

(Tr. 205).

A discharge summary from Columbia Hospital South, for an admission from January 11, 1996, to January 17, 1996, documents that plaintiff was discharged with final diagnoses of:

11

1.   Alcohol Withdrawal

2.   Previous closed head injury affecting left side of
     brain producing 1) nonspecific depression, 2) left
     hemispheric hyperexcitability and seizure, and 3)
     chronic seizure activity.

(Tr. 181).

An EEG/brain mapping and a 24-hour EEG[4] revealed ". . .
an almost global hemispheric lack of normal function with
hyperexcitability and seizure activity" (Tr. 181).

Plaintiff went to Dr. Dysart with symptoms of alcohol
withdrawal prior to his admission. At discharge, he was
prescribed Prozac, Tegretol, and Rivia. He was encouraged to
make arrangements to see a counselor (Tr. 181).

Medical Records from Stephen Christiansen, M.D., dated
January 10, 1996, to February 17, 1999 (Tr. 160-169) show
that plaintiff went to Dr. Christiansen approximately 14
times for treatment during this time. Plaintiff was treated
for a variety of complaints including alcohol withdrawal
(Tr. 169), seizure disorder (Tr. 168), carpal tunnel
syndrome (Tr. 167), depression (Tr. 166), hypertension (Tr.
165) and diabetes (Tr. 162). A diagnosis of bipolar disorder
was also recorded in 1998 (Tr. 161). Plaintiff listed his
then-current medications as Wellbutrin, Lopressor, HCTZ, and

_____

[4]An EEC (electroencephaloram) is a graphical record of
electrical activity in the brain. www.unicormed.com/abbrev.

Prinivil.

Plaintiff was evaluated by Dr. Stephen Christiansen on May 17, 1996, for symptoms of pain, numbness, and tingling in both upper extremities. A diagnosis of bilateral carpal tunnel syndrome[5] was made. It was recommended that plaintiff have surgery on his right hand and receive an injection in the left. He agreed to this, and surgery was scheduled for June 1996 (Tr. 200-203).

A letter from Wanda K. Brisco, M.Ed., CSAC-II, Burrell Behavioral Health, to Charles Salveter at Vocational Rehabilitation, dated September 4, 1996, states that plaintiff was admitted as an outpatient client on June 19, 1996. He was being treated for depression and was recovering from alcoholism. The social worker noted that the treatment might continue for up to one year (Tr. 183).

Plaintiff went to Burrell Behavioral Health Center for psychosocial evaluation on October 14, 1996, on referral from Cynthia Black (Tr. 474-478). He reported recurrent depression and a history of alcoholism, although he did state that he was currently sober. He denied ever being in

---

[5]Carpal tunnel syndrome is defined as a condition where there is a disturbance of the median nerve in the wrist as it passes through the carpal tunnel. DSHI Systems, Inc. (1998-2006).

the hospital and stated that he was a strong person but that he did become overemotional and very sensitive about certain issues. Plaintiff reported a long history of alcohol abuse beginning in 1985 when his mother died. He admitted to almost losing one job secondary to his alcoholism, but sobered up after being placed on a two-week leave by his boss. After interview, the clinician made the following diagnosis:

Axis I:   . . . Major Depression, Recurrent; . . .
          Alcohol Abuse

Axis V:   51/62

(Tr. 478).

It was recommended that plaintiff continue treatment with his physician and present for therapy on a weekly basis (Tr. 478).

Plaintiff went to the Cox Medical Center emergency room on February 22, 1997, with a complaint of back pain and numbness down his lower extremities and the right anterior aspect of his thigh. Some pain and tenderness was noted on the right side of the lumbosacral spine. He had full range of motion with negative straight and crossed straight leg raises. X-rays were normal. He was given Flexeril and Darvocet and discharged to home with a diagnosis of

14

Lumbosacral strain with pain (Tr. 264-265).

Plaintiff went to the Cox Medical Center emergency room on May 29, 1997, with a complaint of chest pain. Physical examination was unremarkable except for pain in the gastric region on palpation. An ECG[6] showed "normal sinus rhythm[7] with nonspecific T-wave abnormality, possible left ventricular hypertrophy criteria met but no acute ischemic[8] changes are identified. Chest x-ray negative for acute pathology" (Tr. 263). Plaintiff was diagnosed with Alcoholic gastritis and Alcoholic withdrawal. He was prescribed Prilosec, Mylanta, and Librium and discharged to home. (Tr. 263).

On May 13, 1998, plaintiff went to the Cox Medical Center emergency room with a complaint of high blood pressure. He reported that he had quit drinking about 3 days earlier and had felt "out of it" (Tr. 259). Upon examination, it was revealed that Mr. Lemmon's blood pressure was 192/122. He was subsequently admitted to the

---

[6]ECG refers to an electrocardiogram.

[7]Sinus rhythm is the regularity of the heartbeat. DSHI Systems, Inc. (1998-2006).

[8]Ischemic means affected by the ischemia, a low oxygen state usually due to an obstruction of the arterial blood. DSHI Systems, Inc. (1998-2006).

15

hospital for detox and hypertension (Tr. 260). A discharge
summary, undated, recorded the following significant
findings and discharge diagnoses:

> He is having difficulty with withdrawal. He stopped
> drinking about three days prior to admission and
> started having hallucinations. He had been on Lopressor
> and Hydrochlorothiazide. He was supposed to be taking
> those under the care of Dr. Steven Christiansen. He was
> also seeing Dr. Dorsey Dysart who said he had some sort
> of seizure disorder. The patient does not understand
> the seizure disorder. Apparently he had had some brain
> mapping. Blood pressure is 192/122 and the blood
> pressure then normalized at the time of a more complete
> exam. His glucose is 273 and his serum ethanol is 0.
> The patient was detoxed using Addiction Research
> Foundation protocol using Librium and Thiamine. It was
> discovered that his diabetes could only be handled
> through using insulin. He was to follow up with Dr.
> Romero and Dr. Chase had seen him. He was given
> diabetic teaching. The patient was still ambivalent
> about quitting drinking even though we clearly
> explained to him the difficulties with drinking.
>
> DISCHARGE DIAGNOSES:
>
> Axis I:   Alcohol withdrawal, resolved. . . .
>
> Axis III: Insulin-dependent diabetes mellitus.[9]
>           Hypertension.[10] Obesity. Hyperglycemia.[11]

---

[9]Diabetes mellitus is a disorder that is caused by
insufficient production of the pancreatic hormone insulin.
DSHI Systems, Inc. (1998-2006).

[10]Hypertension is an above-normal systolic or diastolic
blood pressure.  It is a risk for the development of heart
disease, peripheral vascular disease, stroke, and kidney
disease.  DSHI Systems, Inc. (1998-2006).

[11]Hyperglycemia is an abnormal elevation in the blood
glucose concentration.  Normal fasting blood glucose should

Case 6:04-cv-03461-REL   Document 21   Filed 03/31/06   Page 16 of 120

> Carpal tunnel syndrome on the right, status
> post release. Questionable seizure disorder.

> Axis IV: Partial disability but he works. He lives
> alone, long term separation from wife
> apparently.

> Axis V: A Global Assessment of Functioning of 32. A
> Global Assessment Functioning in the last
> year of 50.

(Tr. 255).[12]

On February 9, 1999, plaintiff complained of chest pain. An x-ray revealed infiltrates consistent with pneumonia (Tr. 253).

A Cox Medical Center Discharge Summary, dated March 8, 1999, from Mark Carlson, M.D., documents that plaintiff was admitted to the hospital for chest pain and that a stent[13] was subsequently inserted. Plaintiff planned to go to Oxford House and to get into Cardiac Rehab and follow up with Dr. Cohn. The physician recorded a final diagnosis of:

> Axis I: Alcohol Dependence . . .

---

be 70-110 mg./dl. DSHI Systems, Inc. (1998-2006).

[12]A GAF of 32 means that there is some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgement, thinking or mood; and a GAF of 50 reflects serious symptoms or any serious impairment in social, occupational or school functioning.

[13]A stent is a device used to treat narrowed arteries due to atherosclerosis. DSHI Systems, Inc. (1998-2006).

17

```
Axis III:  Non-insulin dependent diabetes mellitus,
           Coronary artery disease, status post stent
           placement with chest pain only on severe
           exertion

Axis IV:   He is questionably disabled. He is still
           working out those details.

Axis V:    Global Assessment of Functioning Scale 48,
           Global Assessment of Functioning scale in the
           last year, 52
```

(Tr. 249).

On March 9, 1999, plaintiff went to the Cox Medical Center emergency room with chest pain. It was noted that he had been discharged from Detox on the previous day. He was admitted to the hospital (Tr. 247-248).

On March 10, 1999, a Rest and Stress Sestamibi Study was performed. The following clinical impression was formed:

1.  Optimal cardiac stress level with patient attaining 89% of maximum predicted heart rate.

2.  Moderately large area of apparent reversibility in the inferior and posterior basilar wall which is thought to be equivocal for mild ischemia. There is definitely a component of diaphragmatic attenuation evident on the raw data which conceivably may cause this artifact. Confidence level #3.

3.  Mild to moderate hypokinesis of the posterobasilar wall. Remainder of the left ventricle contracting normally. LVEF equals 60%.

(Tr. 245-246).

On March 18, 1999, plaintiff went to the Cox Health Center emergency room and reported that he had an episode of disorientation of about one minute in length. He also reported severe coughing (Tr. 221). A chest x-ray was normal (Tr. 219). An ECG noted that "QT had lengthened – Nonspecific T wave abnormality now evident in inferolateral" (Tr. 220). Plaintiff was given a diagnosis of syncope (fainting), (Tr. 223), and discharged to home in stable condition.

On April 19, 1999, plaintiff was discharged from the Center For Addictions. (Tr. 251-252).

A Cox Hospital discharge summary, dated May 28, 1999, states that plaintiff had a complaint of chest discomfort, which occurred a couple of times for five to six minutes and then went away (Tr. 186). He underwent a coronary angiography and retrograde left heart catheterization with angioplasty of his left anterior descending with stenting. He was discharged to home with prescriptions for Lipitor, Prinivil, Nitrostat, Plavix, and Glyburide (Tr. 185). The discharge diagnoses were:

1.     Artherosclerotic heart disease.

2.     Unstable angina.[14]

3.     Hyperlipidemia.

4.     Diabetes mellitus.

5.     History of alcoholism.

6.     Essential hypertension.

(Tr. 185).

A Cox Medical Center Discharge Summary, dictated on June 25, 1999, but otherwise undated, states that plaintiff was admitted to the hospital after experiencing chest pain. He underwent coronary angiography and retrograde left heart catheterization. No significant obstruction was found. His two stents were in good condition. It was opined that plaintiff's pain was probably not angina pectoris, but GI in origination (Tr. 238).

On July 14, 1999, plaintiff went to Ferrell Duncan Clinic and saw Dr. Hills. Plaintiff was status post angioplasty[15] times two and reported that he was doing well. He was to return to Dr. Cohn for follow-up (Tr. 277).

---

[14]Angina is chest pains caused by inadequate delivery of oxygen to the heart.  DSHI Systems, Inc. (1998-2006).

[15]Angioplasty is the surgical repair of a blood vessel. DSHI Systems, Inc. (1998-2006).

20

An evaluation report by Lakes Country Rehabilitation Center, dated August 11, 1999, shows that plaintiff was referred to Lake Country for evaluation by vocational rehabilitation. It is recorded that plaintiff's primary disability was chemical dependency, secondary disabilities listed included bilateral carpal tunnel syndrome, cardiac problems, and diabetes. Plaintiff also reported problems with his left knee, a bad back, high cholesterol, depression, and alcoholic liver disease (Tr. 171). His functional limitations included limited lifting, history of substance abuse, limited pushing and pulling, limited walking, poor physical stamina, low stress tolerance, limited activity with the left hand, and limited carrying (Tr. 171). Plaintiff stated that his goal was to obtain a bachelor's degree in order to pursue a career as a field claims adjuster (Tr. 171). Barriers to plaintiff's employability included his functional limitations, his residence in a halfway house, and depression for which he was not taking medication (Tr. 171).

Plaintiff reported a long history of alcohol abuse and resulting in several legal problems. He reported that he had previously been through two treatment programs at Cox Hospital, one in 1995 and a second in 1999. He reported that

21

he had remained sober since that time. He continued to attend aftercare programs through Cox and occasionally an AA meeting.

At the time of this evaluation, plaintiff reported that he was doing very well with his recovery (Tr. 172).

Plaintiff also reported two suicide attempts in 1994. He reported that he was diagnosed with depression in 1994, following these attempts. He stated that he had been treated for depression at Burrell in 1996 or 1997. This treatment lasted for 15 months until he started drinking. Plaintiff had twice been to Ozark Counseling Center, but quit because he did not like the counselor. Previously, plaintiff had been prescribed Prozac, Trazodone and Wellbutrin. Plaintiff admitted that he was probably depressed and could use some counseling (Tr. 173).

Plaintiff reported that Dr. Paff had told him in May of 1999 that he was disabled from working for a period of one year and that he was to be re-evaluated by Social Security after his cardiac rehabilitation was completed (Tr. 173).

Plaintiff reported being fired from three positions throughout his working career. He reported some difficulties getting along with supervisors, but denied any difficulties getting along with co-workers (Tr. 174).

Plaintiff was administered the Woodcock-Johnson Tests of Achievement-Revised, the C.I.T.E. Learning Styles Evaluation, a General Aptitude Test Battery, and Career Occupational Preference System. He was given the supplemental tests of Wonderlic Personnel Test, Computer Aptitude, Literacy, and Interest Profile, Tower Clerical-Business Math Test, and the Electronics Institute Pretest (Tr. 174-177). The evaluator drew these conclusions from the tests:

Mr. Lemmon demonstrated good academic abilities on the Woodcock-Johnson Tests of Achievement-Revised (WJR). He was in the above average range for Broad Reading and Broad Math abilities and in the average range for Broad Written Language abilities. Mr. Lemmon's strength on the academic testing was in the area of Letter-Word Identification with a grade equivalency of 16.9. His weakest area was Dictation with a grade equivalency of 8.9.

Mr. Lemmon's aptitude testing on the General Aptitude Test Battery (GATB) revealed above average clerical perception and motor coordination with high average verbal aptitude, numerical aptitude, and spatial aptitude. He demonstrated average form perception with below average finger dexterity and manual dexterity. His general learning score of 121 is above average. His strength on the aptitude testing was in the area of motor coordination with his weakest area being manual dexterity.

Mr. Lemmon's supplemental testing revealed an individual of above average abilities in the areas of logic, reasoning, and general intelligence. Plaintiff demonstrated an above average performance on the Wonderlic Personnel Test and a high average performance on the Computer Aptitude, Literacy and Interest

23

Profile. He demonstrated above average math skills as can be seen from his scores on the Tower Clerical #1-Business Math Test and on the Electronics Institute Pretest. Mr. Lemmon has the academic skills and abilities to attend up to four years of college level training; however, that is not being recommended at this time.

Mr. Lemmon has the academic skills and abilities to attend up to four years of college level training. However, that is not being recommended at this time, due to Mr. Lemmon's numerous physical and psychiatric issues. While Mr. Lemmon certainly has the academic abilities needed to complete a four year college program, it is felt that his attempting to attend school without addressing these issues would prove to be unsuccessful. Should Mr. Lemmon resolve these issues, a recommendation for four years of college would be much more realistic. Mr. Lemmon should keep in touch with his Vocational Rehabilitation Counselor to keep him apprised of his progress in addressing these issues and for further vocational guidance.

(Tr. 177).

The records show that plaintiff completed his one week evaluation in its entirety while maintaining appropriate attendance and punctuality. His stated goal at the beginning of the evaluation was to obtain a bachelor's degree and this remained unchanged after the evaluation. This goal was deemed to be realistic after testing. However, the evaluation team noted:

Mr. Lemmon has many unresolved health issues at this time that should be addressed before training is considered. He is also early in his recovery and lives in a somewhat unstable living environment. Mr. Lemmon also has a diagnosis of depression and is not currently being treated for symptoms of depression through

24

therapy or medications. It is believed that unless some
of these issues are addressed initially, his chances of
successfully completing a training program are guarded.

(Tr. 178).

The following recommendations were made:

1.   Although Mr. Lemmon has the requisite abilities to
     pursue further training up to four years in
     length, the Evaluation team concur that at this
     time he has many unresolved health issues that
     should be addressed initially. These include
     possible Carpal Tunnel release surgery and
     completing Cardiac Rehabilitation. It should be
     noted Mr. Lemmon reported during the Evaluation he
     did not believe he was capable of working or
     attending training on a full time basis at the
     present time.

2.   Recommend Mr. Lemmon seek services to address
     issues of depression. According to Mr. Lemmon, he
     was diagnosed with depression in 1994, and is not
     currently treating these symptoms through
     medication or therapy.

3.   Once Mr. Lemmon has addressed the above issues, it
     is recommended he consult further with his
     Vocational Rehabilitation Counselor regarding his
     goal to obtain a bachelor's degree to pursue a
     career as a Field Claims Adjuster and for further
     vocational planning. It appears unlikely at this
     time that Mr. Lemmon could successfully pursue or
     complete a training program on a full time basis
     unless his overall physical stamina improves. Mr.
     Lemmon is also early in his recovery and pursuing
     a training program at this time may exacerbate
     levels of stress and his psychiatric symptoms.

4.   Mr. Lemmon would benefit from attending Alcoholics
     Anonymous meetings on a consistent basis to assist
     him in maintaining sobriety.

(Tr. 180).

Plaintiff went to Burrell Behavioral Health Center and again underwent clinical assessment on August 25, 1999, on referral from Vocational Rehabilitation (Tr. 465-467). Plaintiff reported that he was depressed, lethargic, hopeless, and slept all the time. He felt like he was at risk for relapsing with alcohol, although he stated that he had been sober for six months. He reported that he was not on any medication for his depression at the time of the assessment. Plaintiff stated that he had graduated from Cox North inpatient treatment on May 20th and was currently enrolled in their aftercare program, as well as AA (Tr. 465). Plaintiff reported that he was living at Oxford House and was house president. He planned to attend SMSU in the spring (Tr. 466). The clinician noted that plaintiff was cooperative and calm. His affect was appropriate and his mood was depressed. His judgement and insight were intact (Tr. 466). No further evaluations were deemed necessary (Tr. 466). A diagnosis was made of:

> Axis I:   Major Depressive Disorder, recurrent, moderate; Alcohol Abuse in Remission . . . .
>
> Axis III: Coronary disease, diabetes, hypertension
>
> Axis IV:  Occupational-severe; housing-moderate; economic-severe; health-severe

Case 6:04-cv-03461-REL   Document 21   Filed 03/31/06   Page 26 of 120

Axis V:   GAF-55[16] current

(Tr. 467).

On August 30, 1999, at St. John's Regional Medical Center, plaintiff underwent endoscopic carpal tunnel release on his left hand (Tr. 412).

On September 9, 1999, plaintiff was provided with a cock-up splint for his left hand by the physical therapy department (Tr. 413).

On September 13, 1999, Dr. Hills at Ferrell Duncan Clinic noted that plaintiff was doing well. His Prinivil was increased from 30 mgs a day to 40 mgs a day. The physician made a clinical impression of:

1.   Artherosclerotic heart disease without angina status post angioplasty

2.   History of alcoholism

3.   Diabetes Mellitus

4.   Hyperlipidemia

5.   Essential hypertension, 160/80

"* All treated".

(Tr. 274).

---

[16]A GAF of 55 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning.

Case 6:04-cv-03461-REL   Document 21   Filed 03/31/06   Page 27 of 120

On September 28, 1999, plaintiff went to Dr. Michael Grillot at Ferrell Duncan Clinic with a complaint of pain in the right metacarpal head region between the ring and middle finger. He was status post bilateral carpal tunnel release. No obvious findings were noted on physical examination and the physician injected the area with Xylocaine and Celestone. (Tr. 272).

A October 12, 1999, report from Dr. Anderson at the Cardiac Catheterization laboratory states:

CORONARY ARTERIES:
1.    The right coronary artery has a 40 to 50% proximal stenosis [blockage]. The previously placed stent has a 30% stenosis. There is noted 10 to 20% stenosis distal to the stent. Review of the previously done angiogram, June 25, 1999, shows no change in anatomy.

2.    The left main is free of obstructive disease.

3.    The left anterior descending artery is widely patent at the previously placed stent site. The rest of the vessel appears to be relatively free of obstructive disease.

4.    The circumflex coronary artery is a small nondominant vessel and appears free of disease. LEFT VENTRICULOGRAM: This was performed in a 35 degree RAO projection. There is no gradient across the aortic valve. There is no mitral regurgitation. There is normal left ventricular systolic function.

(Tr. 226).

Case 6:04-cv-03461-REL   Document 21   Filed 03/31/06   Page 28 of 120

Dr. Anderson recommended an evaluation for noncardiac causes of the chest pain, noting that there had been no change in anatomy since the previous angiogram (Tr. 227).

In an October 12, 1999, report from the Cardiac Catheterization laboratory, Dr. Hills recorded that following findings and conclusion:

LEFT CORONARY ARTERY: The left main coronary artery was a normal artery. It gave off an anterior descending and circumflex vessel. The anterior descending became about 40% narrowed and gave off a septal perforator and second diagonal branch. It then opened up into a good distal vessel.

The circumflex vessel gave off an obtuse marginal branch and posterolateral branch. The circumflex vessel and all of its branches were free of any obstructive disease.

RIGHT CORONARY ARTERY: The right coronary artery gives off a sinus node branch and a clonus branch. In its proximal portion, it becomes about 50-60% narrowed. In some views, it looked this tight, and in other views, it looked more like 50%. In some views, it looked 60-70%. The rest of the right coronary artery was normal.

LEFT VENTRICULOGRAM: Ventriculogram showed no areas of hypokinesia or dyskinesia. All areas contracted normally and vigorously. End diastolic pressure was 5. There was no gradient on pullback across the aortic valve.

CONCLUSION: Significant atherosclerosis with 40% disease scattered throughout the proximal left anterior descending and a borderline lesion in the right that is almost bad enough for angioplasty. Will do medical treatment, and if symptoms continue, will do thallium. He may need to have coronary angioplasty and stenting of the right, which would be amenable.

29

(Tr. 228-229).

On October 13, 1999, plaintiff went to the emergency room at St. John's Regional Medical Center with a complaint of chest pain (Tr. 399). A chest x-ray failed to show any acute cardiopulmonary disease, (Tr. 408), although 2 ECG's were assessed as being abnormal, (Tr. 404, 409). A gallbladder ultrasound was abnormal and also revealed a lesion on the liver (Tr. 406-407). Plaintiff was instructed to follow up with his physician and was prescribed Percocet for the pain (Tr. 405). Plaintiff underwent a cholecystectomy on November 2, 1999 (Tr. 393-397).

On October 28, 1999, plaintiff went to Dan Park, D.P.M., with a complaint of a painful, stinging, burning sensation on the ball of his feet times two to four months. Physical examination revealed pulses of 1/4 bilaterally for dorsalis pedis and 3/4 bilaterally for posterior tibial. Capillary fill was immediate. Severely diminished vibratory and sharp/dull sensations were noted on the forefoot bilaterally. Anesthesia was also noted on the left midfoot in the area of the medial dorsal cutaneous nerve. 10 gram monofilament wire test was within normal limits. No pain was noted on orthopedic examination. The physician assessed: (1)

30

Neuritis of medial dorsal cutaneous nerve of the left foot, and (2) Probable diabetic neuropathy/alcohol neuropathy (Tr. 295). Plaintiff declined treatment and was told to return if the symptoms got worse (Tr. 296).

On November 10, 1999, plaintiff reported to Dr Grillot at Ferrell Duncan Clinic that the injection in his hand had helped and that he had no pain (Tr. 269).

St. John's Regional Medical Center lab results dated December 7, 1999, document a high glucose level of 219 (Tr. 344).

Plaintiff went to Kelly Trygg, M.D., for initial evaluation on December 7, 1999. He complained of hyperglycemia with blood sugars running in the 200-300 range (Tr. 578). On examination, the physician noted that the vital signs were within normal limits, although the diastolic blood pressure was slightly high at 90. Pulses were mildly diminished in both feet but there was no edema.[17] Plaintiff reported constant numbness and pain in the metatarsal heads of both feet (Tr. 577). The physician diagnosed:

---

[17]Edema refers to swelling. DSHI Systems, Inc. (1998-2006).

1)    Type 2 diabetes, under suboptimal[18] control;

2)    Hypertension, probably under unacceptable control;

3)    Ischemic heart disease.

(Tr. 576).

Plaintiff reported his medications as Prevacid, Lipitor, Prinivil, Glyburide, and Toprol. The Glyburide was switched to Glucophage (for diabetes), but all other medications remained the same (Tr. 576).

St. John's Regional Medical Center lab reports dated December 10, 1999, document high values for triglycerides and Cholesterol/HDL Ratio (Tr. 343).

Plaintiff went to Burrell Behavioral Health Center for psychiatric evaluation on December 13, 1999, on referral from Wanda Holloway, his outpatient therapist (Tr. 460-463). Plaintiff reported problems with depression for the previous two to three weeks with decreased sleep, low energy, and fair appetite. He admitted to a history of racing thoughts and difficulty with concentration (Tr. 460). Plaintiff stated that he planned to continue in college in January 2000 to obtain a major in business. Plaintiff's thought content was goal directed and his insight and judgement were

---

[18]Suboptimal means less than optimum. *Steadman's Medical Dictionary*, 27th ed., 1717.

fair. A diagnosis of chronic major depression was made and a GAF of 75-80[19] was assigned. Plaintiff was advised to continue his therapy with Wanda Holloway and was given a prescription for Celexa 20 mgs at bedtime (Tr. 462).

Plaintiff went to Kelly Trygg, M.D., on December 17, 1999, for follow-up. He stated that his blood sugars had been a little high, but were improving on the Glucophage (Tr. 575).

A St. John's Regional Medical Center Nuclear Medicine Consultation, dated February 14, 2000, documents the findings of a Cardiovascular Stress Test with Rhythmic/Treadmill Exercise and Adenosine Provocation (Tr. 374-375). An impression is recorded that:

> Fair to good exercise tolerance with probable blunted chronotropic response secondary to medications. The patient achieved 67% maximum predicted heart rate with target being 85%. The patient achieved his maximum exercise effort.
>
> Satisfactory pharmacologic stress in preparation for myocardial perfusion imaging. There was no clinical or electrocardiographic evidence of ischemic response.

(Tr. 374-375).

---

[19]A GAF of 75-80 indicates that it symptoms are present, they are transient and expectable reactions to psychosocial stressors; no more than slight impairment in social, occupational, or school functioning.

Case 6:04-cv-03461-REL   Document 21   Filed 03/31/06   Page 33 of 120

A St. John's Regional Medical Center Nuclear Medicine Consultation, dated February 14, 2000, documents the findings of a Radionuclide Myocardial Perfusion Spect/Rest Stress Wall Motion Ejection Fraction Evaluation. An impression is recorded of:

> There are no reversible/ischemic changes to suggest critically obstructed coronary disease. Myocardial distribution of tracer is physiologic suggesting viability throughout. There is normal regional and global left ventricular systolic function. The left ventricular end diastolic volume maybe slightly elevated.

(Tr. 373).

Plaintiff went to Kelly Trygg, M.D., on March 2, 2000, with complaints of chronic cough times two months, progressively worsening dyspnea,[20] and edema of the legs and ankles, eye problems, and chronic low back pain. He stated that the edema was intermittently severe enough as to make wearing shoes painful. The physician noted that plaintiff's blood sugars were improved on Prandin (Tr. 572). Physical examination was unremarkable. Chest x-rays failed to reveal a source of the coughing (Tr. 516). Plaintiff was prescribed Diovan to replace Prinivil, which was felt may possibly be contributing to the cough. He was otherwise continued on the

---

[20]Dyspnea is difficulty in breathing. DSHI Systems, Inc. (1998-2006).

34

same medications (Tr. 572-573).

On March 7, 2000, plaintiff went to Dr. Grillot at Ferrell Duncan Clinic with a complaint of pain in the right hand between the 3rd and 4th fingers. He was injected with Xylocaine and Celestone (Tr. 268).

A medication chart from Ferrell Duncan Clinic, dated March 7, 2000, documents that plaintiff's medications at that time were Prevacid, ASA, Lipitor, Prinivil, Glyburide, Plavix, and Toprol (Tr. 266).

On March 15, 2000, plaintiff called the physician at Ferrell Duncan Clinic to report that the injection was not helping (Tr. 269).

On April 14, 2000, plaintiff went to Dan Park, D.P.M., and underwent a matricectomy on his left big toe for a diagnosis of onychocryptosis, or ingrown toenail (Tr. 294).

On April 14, 2000, Kelly Trygg, M.D., noted that plaintiff's blood sugars were uncontrolled. He reported no side effects from the Prandin and Glucophage. Plaintiff reported some intermittent swelling of his ankles and had taken Lasix to reduce this. Plaintiff also reported some red dots on his left great toe. The physician increased the Prandin to 1 mg before breakfast and dinner and plaintiff was additionally placed on Keflex for the toe (Tr. 570-571).

35

An x-ray of the lumbar spine, performed by Kelly Trygg, M.D., on April 28, 2000, revealed moderate disc space narrowing of the L3-4 disc level and facet changes at L4-5 and L5-S1 (Tr. 515).

On April 28, 2000, plaintiff reported to Dan Park, D.P.M., that the surgical area had completely healed and that he was very happy with the progress. Examination revealed no sign of drainage, cellulitis, or infection (Tr. 293).

A St. John's Regional Medical Center Medical Imaging Consultation, dated April 28, 2000, documents the results of a lumbar spine x-ray as follows:

> The lumbar spine alignment appears within normal limits. There is no evidence of fracture or subluxation. Moderate disc space narrowing is present at the L3-4 disc level. The remaining intervertebral disc heights appear within normal limits. Facet degenerative changes are present at L4-5 and L5-S1 disc levels.

(Tr. 346).

On May 2, 2000, plaintiff returned to Kelly Trygg, M.D., and complained of chronic low back pain in the lower lumbar area of his back, mainly on the right side. The pain did not interfere with his sleep. Plaintiff reported that he would occasionally feel a numb sensation go down the

36

posterior left thigh and stop at the knee, but he denied leg weakness or falls. Some tenderness without notable spasm was found on the right mid-lumbar area. Plaintiff was able to go to about 60 degrees with passive straight leg raises. He had normal reflexes, could heel/toe walk, get up and down from the examining table, and bend at the waist to 90 degrees. He was diagnosed with chronic back pain and prescribed Vioxx 25 mgs. He was additionally referred to physical therapy (Tr. 568-569).

Plaintiff was referred to physical therapy by Kelly Trygg, M.D., for evaluation and treatment of chronic low back pain. An initial assessment was performed on May 5, 2000 (Tr. 370-371). Plaintiff reported long-standing low back pain with an exacerbation three weeks earlier. He stated that his pain was exacerbated with prolonged standing and decreased with sitting and rest. The therapist stated:

> [He] presents with mechanical low back pain associated with joint restrictions . . . as well as muscular tightness and ligamentous irritation.

(Tr. 371).

A Medical Psychiatric/Psychological Source Statement-Mental, completed by Nicodemus Garcia, M.D., dated June 14, 2000, shows that he physician assessed that plaintiff was moderately limited in the ability to:

37

- Carry out detailed instructions

- Understand and remember detailed instructions

- Maintain attention and concentration for extended periods

- Accept instructions and respond appropriately to criticism from supervisors

- Get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- Respond appropriately to changes in the work setting

(Tr. 282-283).

The physician further assessed that plaintiff was markedly limited in the ability to:

- Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

(Tr. 283).

A June 16, 2000, St. John's Regional Medical Center discharge summary from Physical Therapy, documents that plaintiff was treated with physical therapy 11 times and that he reported a 50% improvement in his symptoms. He was discharged on June 16, 2000, with instructions to continue his home exercise program (Tr. 351).

On July 11, 2000, plaintiff went to Kelly Trygg, M.D., for follow up of his blood pressure and blood sugar. He stated that his blood pressure had been consistently high.

38

It was 150/94 on this date. He reported a lot of fatigue

from his medications and stated that he had moved his Adalat

dose to the evening. The physician diagnosed:

1.  Type 2 diabetes mellitus. It is difficult to
    assess level control as he has not had any blood
    testing done here since March and he is not
    checking sugars at home.

2.  Hypertension, under suboptimal control.

3.  Intermittent painful left great toenail, likely
    secondary to onychomycoses.

4.  Hypercholesterolemia and hypertriglyceridemia, not
    assessed since December.

(Tr. 566).

The Adalat was increased to 60 mgs a day and plaintiff

was given a script for Flexeril to treat chronic back pain

(Tr. 566-567).

On July 14, 2000, plaintiff went to Dan Park, D.P.M.,

with a complaint of pain in his left great toe. Physical

examination revealed a thickened mycotic nail on the left

hallux, but no regrowth of the nail from the partial

matricectomy. The area was curetted and flushed and the

mycotic nail removed (Tr. 292).

On August 3, 2000, plaintiff went to the St. John's

Regional Medical Center emergency room with a complaint of

chest pressure and swollen legs (Tr. 353). He also

39

complained of dizziness, orthopnea,[21] blurred vision, abdominal pain, shoulder pain, and urinary retention (Tr. 354). All blood work was normal (Tr. 355). Plaintiff was diagnosed with lower extremity edema and discharged to home with instructions to continue his medications and see his family doctor (Tr. 358).

On August 7, 2000, plaintiff went for follow-up to Kelly Trygg, M.D., on his leg edema, for which he had been seen in the emergency room on August 3, 2000. He reported that he was taking Lasix 3 times daily and was feeling better, although he complained of urinary urgency, frequency, and dribbling. Plaintiff also reported loose stools as a side effect of the Pranin and Glucophage. The physician stopped the Prandin and prescribed NPH Insulin, Humulin 15 units at bedtime. Lasix was discontinued and replaced with Demadex 20 mgs daily. He was to continue his other medications (Tr. 564-565).

In a Burrell Behavioral Health Center Clinical Assessment Update from Wanda Holloway, dated August 30, 2000, it is noted that plaintiff had been free from alcohol for 18 months. He continued to go to AA meetings and contact

---

[21]Orthopnea is a shortness of breath when lying flat. DSHI Systems, Inc. (1998-2006).

Case 6:04-cv-03461-REL   Document 21   Filed 03/31/06   Page 40 of 120

his sponsor. He was in his third semester at SMSU, with the classes being paid for by Vocational Rehabilitation. The clinician stated that there were no additional changes at that time (Tr. 455).

On September 8, 2000, plaintiff went to Kelly Trygg, M.D., and reported that his blood sugars were running about 222. He reported that his Celexa had been increased and that he felt that this had helped his depression. The physician diagnosed:

1.  Type 2 diabetes mellitus, still under suboptimal control.

2.  Hypertension, under good control. He does feel like he has some dizziness when he stands up rapidly. I suspect this is due to his blood pressure medication. Obviously, we may have to make some changes if this evolves into a building problem.

3.  High risk medication, Demodex.

(Tr. 563).

On September 13, 2000, plaintiff went to Dan Park, D.P.M., and requested that the entire left great toenail be removed. It was agreed that the procedure would be performed at the next visit (Tr. 291).

On September 17, 2000, plaintiff went to the St. John's Regional Medical Center emergency room with a complaint of possible seizure. He stated that he was very dizzy but did

41

not lose consciousness. He complained of light-headedness and chest pressure with pain after the episode. He was discharged to home with a diagnosis of "near syncope probably orthostatic" (Tr. 327-330).

On September 22, 2000, plaintiff went to Dan Park, D.P.M., with a painful, thickened, mycotic ingrown nail on his left great toe. Plaintiff requested permanent removal of the nail and this was performed (Tr. 290).

On September 27, 2000, plaintiff went to Dan Park, D.P.M., with a complaint of pain in his left foot with walking. He reported an increase in swelling and redness since the previous day. After examination, the physician diagnosed "Localized cellulitis of the left hallux" and cleaned the area. Plaintiff was given a prescription for Cephalexin (Tr. 291).

On October 2, 2000, plaintiff went to Dan Park, D.P.M., with pain in his left great toe. Upon questioning, he admitted that he had not read the after-care surgical instruction sheet and had not been cleaning the area with hydrogen peroxide as instructed. The area was cleaned and plaintiff was instructed to continue on his antibiotics (Tr. 289).

42

On October 11, 2000, plaintiff reported improvement to Dan Park, D.P.M. (Tr. 288).

On October 20, 2000, Kelly Trygg, M.D., noted that plaintiff had 1+ pitting edema on the tops of both feet and that the pulses were poorly palpable in the feet. He reported some lightheadedness on standing. His blood pressure on this visit was 102/68. The physician attributed this dizziness with standing to his blood pressure being too aggressively treated and to his persistent bradycardia. It was noted that his diabetes was still under suboptimal control. Plaintiff was instructed to decrease his Toprol to 50 mgs a day (Tr. 562).

St. John's Regional Medical Center laboratory results, dated October 20, 2000, document high values for Glucose, Triglycerides, and Cholesterol. Mr. Lemmon's HDL cholesterol was low (Tr. 333).

On November 1, 2000, plaintiff went to Dan Park, D.P.M., with a complaint of redness in the area of his left great toe. Slight paronychia was noted on examination. The area was cleaned and a prescription for Cephalexin was written (Tr. 287).

On November 16, 2000, plaintiff went to Kelly Trygg, M.D., and reported that he was continuing to have

43

difficulties with dizziness and lightheadedness when moving from a sitting to standing position after two hours of sitting in one of his classes. He stated that this did not happen any other time. He also complained of jaw aching at night, with occasional radiation into his left shoulder. This was not accompanied by any other cardiac symptoms. His blood pressure was 120/80. The physician ordered a stress test and Holter monitor in light of the possible angina pectoris (Tr. 559).

A Holter Monitor Report from St. John's Regional Medical Center, dated November 17, 2000, from Stanley Wiggins, M.D., states:

> The patient was monitored for 24 hours and 30 minutes using a continuous 2-channel electrocardiographic recording. The technical quality was adequate.
>
> The underlying rhythm was normal sinus rhythm with rates that varied from sinus bradycardia at 52 beats per minute that occurred at 122 a.m. to sinus rhythm at 93 beats per minute that occurred at 8:25 a.m. The average heart rate was 66 beats per minute.
>
> No prolonged sinus pause or evidence of advanced AV block. The longest R/R interval was 1.9 seconds that occurred at 4:39 a.m.
>
> 50 premature supraventricular complexes were recorded averaging 2 per hour. No evidence of paroxysmal supraventricular tachycardia.

44

>  79 premature ventricular complexes were recorded.
>  Premature ventricular complexes averaged 3 per hour
>  without evidence of nonsustained or sustained
>  ventricular tachycardia.
>
>  A patient activity diary was returned and several
>  activities were noted. When the patient noted
>  cardiovascular symptoms of "minor chest pain or
>  tightness in chest, some chest pain," the patient's
>  symptoms did not correlate with any cardiac
>  dysrhythmia. At 9:23 when the patient stood up and
>  noted "mild faintness", this did not correlate with any
>  cardiac dysrhythmia.

(Tr. 325).

A Physician's Statement for Disabled Persons

Plates/Placard, completed by Kelly Trygg, M.D., dated

December 4, 2000, reflects that plaintiff was severely

limited in his ability to walk due to arthritic,

neurological, or orthopedic condition, and was eligible for

a temporary disability tag until June 4, 2001.


On December 6, 2000, plaintiff called Kelly Trygg,

M.D., to report that he was having angina pain, relieved

with nitroglycerin (Tr. 557).

A St. John's Regional Medical Center Nuclear Medicine

Consultation, dated December 18, 2000, documents the

findings of a Cardiovascular Stress Test with Adenosine

Provocation, Monitoring, and Interpretation. A clinical

impression was made of:

45

Satisfactory pharmacologic stress in preparation for
myocardial perfusion imaging. There was no
electrocardiographic evidence of an ischemic response.

(Tr. 322).

A second St. John's Regional Medical Center Nuclear

Medicine Consultation , dated December 18, 2000, documents

the findings of a Radionuclide Myocardial Perfusion

Spect/Rest Stress Wall Motion Ejection Fraction Evaluation.

A clinical impression was made of:

There are no reversible/ischemic changes to suggest
myocardium at risk or critically obstructed coronary
disease. Findings are unchanged since the previous
study. Normal regional and global left ventricular
systolic function. Findings in the inferior wall most
likely reflect anatomic attenuation in light of no
history of myocardial injury.

(Tr. 323-324).

On January 16, 2001, plaintiff went to Dr. Grillot at

Ferrell Duncan Clinic with a painful third web space on the

right hand. He described the pain as electric shooting pain

with certain movement and use of his hand. The physician

diagnosed possible nerve impingement and an exploratory

decompression was scheduled (Tr. 618).

Lab results from the records of Ferrell Duncan Clinic

document a glucose value of 335 on January 26, 2001 (Tr.

617).

46

On February 7, 2001, plaintiff went to Kelly Trygg, M.D., for a follow-up on his blood sugars. Dr. Grillot had canceled surgery on plaintiff's hand because the blood sugars had been over 300. Plaintiff stated that he was being "fairly consistent" with his diet. (Tr. 492). Fasting labs were ordered and plaintiff was instructed to track his blood sugars in the morning and evening (Tr. 491).

A lab report from the office of Kelly Trygg, M.D., dated February 7, 2001, documents that plaintiff's glucose level was 303 and his triglycerides were 417 (Tr. 509).

On February 12, 2001, plaintiff went to Kelly Trygg, M.D., and reported that his blood sugars were averaging about 288 over a five-day period.

On February 13, 2001, Kelly Trygg, M.D., increased the Prandin to 2 mgs three times a day with meals and increased the NPH insulin to 35 units. The surgery on plaintiff's hand was further postponed (Tr. 546).

On February 23, 2001, plaintiff went to Kelly Trygg, M.D., and reported that his blood sugars were averaging 278 and in response, the physician increased plaintiff's insulin to 40 units (Tr. 542).

On February 23, 2001, plaintiff went to Dan Park, D.P.M., and complained of slight tenderness on walking on

47

his left great toe. He was worried that the nail was growing back. Painful hyperkeratotic tissue was noted on the medial border of the left hallux nail bed. This tissue was debrided (Tr. 287).

In a consultative examination by Charles J. Ash, M.D., dated March 7, 2001, plaintiff reported:

> [H]e has pain in the left knee with instability. He has pain in the right sacroiliac region intermittently, aggravated by standing, bending, and lifting. He has sharp pain in the right palm. He has soreness in the right olecranon region. He has had previous knee cartilage surgery, left knee in 1976 and in 1995. He has persistent angina relieved by nitroglycerin associated with shortness of breath, ulcer symptoms, hypertension, diabetes, depression, swelling in the feet for the past six months.

(Tr. 298).

On general physical examination, Dr. Ash noted that plaintiff stood erect and moved about satisfactorily without limp or list. He had noticeable edema of both feet. He could walk on heels and toes satisfactorily and his leg lengths were equal. He was able to squat one-third normally and had no difficulty arising from the exam table, chair, dressing, or undressing (Tr. 298). Examination of the cervical spine revealed slight limitation in range of motion on extension, (30/45), but no tenderness, muscle spasm, or deformity (Tr. 298-299). Examination of the thoracic and lumbar spine

48

revealed moderated limitation in range of motion on flexion, (45/90) and extension (20/30), but no tenderness, spasm, or deformity (Tr. 299). Slight limitation of motion of the wrists were noted in dorsiflexion (45/60) and palmar flexion (45/70). No weakness, deformity or atrophy was found. Grip and pinch were strong in both hands and there was no sensory deficit (Tr. 299). Straight leg raises were to 60 degrees on the right and 80 degrees on the left. Four plus pitting edema was noted on both calves and feet. Lower extremity pulses were satisfactory. Reflexes were equal and active with normal motion of the hips, knees, and ankles noted. No instability, effusion, deformity, or sensory deficit were found (Tr. 299). The physician diagnosed (1) Probable generalized degenerative arthritis; (2) Severe hypertensive cardiovascular disease; (3) Diabetes; and (4) Depression (Tr. 299). He commented, "This man appears to have some discomfort related to strenuous lifting and bending and prolonged walking. His primary impairment is cardiovascular." (Tr. 299).

A letter from John W. Hawkins, M.D., F.A.C.C., to Dr. Trygg, dated March 8, 2001, states:

> [Plaintiff] underwent outpatient cardiac
> catheterization today at St. John's Regional Health
> Center. I sealed his groin with a 6 French Angio-Seal
> closure device with an excellent technical result.
>
> He has only mild 30% restenosis in his RCA stent and
> 30% restenosis in his LAD stent. He has no new high
> grade narrowings in his LAD, circumflex or RCA.
>
> He does have a small ramus intermedius branch which is
> chronically occluded proximally and tills distally by
> collaterals. I suspect this is the cause of his angina.
> Since it looks chronically occluded and is small in
> caliber, I don't think intervention is an option or
> clinically warranted. The overall ischemic burden is
> small, but this is causing stubborn angina.
>
> I have suggested adding Imdur 30 mg p.o. [orally] daily
> to his medical regimen. If this is ineffective, we can
> increase the dose.
>
> I have instructed him not to drive today and to avoid
> heavy lifting (over 20 lbs.) or exertion for three
> days. I will plan to see him back for an office visit
> in 2-3 months if he remains stable. He was encouraged
> to call for any problems or questions.

(Tr. 538).

A lab report, dated March 8, 2001, from the office of Kelly Trygg, M.D., documents a glucose level of 253 (Tr. 534).

A history and physical from St. John's Cardiovascular Specialists, dated March 8, 2001, states that plaintiff was suffering from "lifestyle limiting chest discomfort consistent with angina pectoris" (Tr. 609). He was admitted to the hospital for a cardiac catheterization.

On March 13, 2001, plaintiff went to Kelly Trygg, M.D., and reported that his blood sugars were running in the high 200's to low 300's. Glucotrol was added to his medication regimen (Tr. 489-490).

On March 20, 2001, Kelly Trygg, M.D., ordered a non-fasting liver profile as a prerequisite to prescribing an insulin sensitizer drug. In a follow-up letter, she wrote:

> Your liver enzymes came back entirely within normal limits. I am thinking we may have to go to one of the insulin sensitizer drugs which is once a day, instead of the Glucotrol XL and that family. In cases like yours, with resistant blood sugars, and being overweight, it is very common that the fat causes you to be more insensitive to the insulin that your body is making and to what we are giving you . . . . If I keep giving you insulin, you will just gain weight and that is not good for any of us. However, on these insulin sensitizer drugs, we must watch the liver enzymes closely for the first year of therapy. The effects on the liver can be similar to what is seen with Lipitor, and you have never had a problem here, but again it merits careful follow up and monitoring. I use these drugs quite frequently in patients with your type of medical problems, including patients that are also on concomitant therapy for high cholesterol. I suspect we will need to start Actos one a day to replace the Glucotrol, but why don't you go ahead and give us a call with some numbers as soon as you get this letter and let us know how you are doing on the increased dose of Glucotrol with your insulin. Again, it is imperative that we try to be as compliant as we can with your diet. We do have a half-day class for diabetics at Smith-Glynn, if you would like to get some re-education here. We will wait to hear from you and your blood sugars . . .

(Tr. 523).

Case 6:04-cv-03461-REL   Document 21   Filed 03/31/06   Page 51 of 120

On a Burrell Behavioral Health Center Disability
Certification, dated March 28, 2001, for HAS Properties,
Wanda Holloway recorded that, in her opinion, plaintiff met
their criteria for disability. (Tr. 450-451).

A Psychiatric Review Technique Form was completed by
Lester O. Bland, Psy.D., a non-examining, non-treating
physician, on March 28, 2001. The physician opined that
plaintiff suffers from affective disorder and substance
addiction disorders, but that they are not severe (Tr. 302).
He further opined that plaintiff is mildly limited in his
ability to:

- Maintain social functioning
- Maintain concentration, persistence, or pace

(Tr. 312).

On May 18, 2001, plaintiff went to St. John's
Cardiovascular Specialists and reported fatigue but no chest
pain. He requested that he be able to stop the Imdur. He was
instructed to decrease the Toprol to 50 mgs per day (Tr.
604-605).

On May 18, 2001, plaintiff went to Kelly Trygg, M.D.,
for a follow-up visit. He reported that his blood sugars
were still in the mid 200 range. Plaintiff's blood pressure
was 104/68 and he reported that his beta blocker had

52

recently been reduced from 100 mgs to 50 mgs by his cardiologist in response to plaintiff's persistent fatigue. Plaintiff also reported that he had stopped his Celexa and Neurontin. He related that he did not think he was going to continue therapy at Burrell and did not want to take any "mind altering" medication (Tr. 488). Plaintiff was diagnosed with:

1.  Abdominal pain of uncertain etiology.

2.  Fatigue, possibly related to the beta blocker therapy or could be due to his blood sugars being out of control

3.  Type 2 diabetes mellitus under suboptimal control with no known complications

4.  High risk medication, Demadex

5.  Artherosclerotic coronary artery disease with no further symptoms of angina pectoris

6.  Congestive heart failure

7.  Hypertension, controlled

(Tr. 487).

A chart, dated May 19 to June 5, 2001, from the office of Kelly Trygg, M.D., documents that plaintiff's average blood sugar during that time was 268 (Tr. 499).

A CT Scan of the liver from the office of Kelly Trygg, M.D., performed on May 29, 2001, revealed fatty infiltration of the liver (Tr. 511).

A radiology report of a chest x-ray from the office of Kelly Trygg, M.D., performed on June 22, 2001, documents an impression of:

Arteriosclerotic cardiovascular disease. Cardiomegaly. Minimal central venous vascular engorgement suggestive of hypertension. No other abnormality or interval change displayed.

(Tr. 510).

On July 9, 2001, Kelly Trygg, M.D., noted that plaintiff's blood sugars were still not under good control, even with 50 units of insulin at bedtime. It was noted that he had 1+ pitting edema in his ankles bilaterally. Plaintiff's Actos dosage was increased to 45 mgs daily (Tr. 494-495).

In a Burrell Behavioral Health Center clinical assessment update, dated August 29, 2001, Ms. Holloway noted that plaintiff was no longer taking his prescribed medications of Celexa and Neurontin, but was trying to maintain without the use of an antidepressant. He had been sober for about two years. He was in his second year at SMSU (Tr. 449).

A chest x-ray was performed on September 10, 2001, at St. John's Cardiovascular Specialists, and found to be normal (Tr. 588).

54

A history and physical, completed as a part of a
hospital admission on September 10, 2001, from the records
of St. John's Cardiovascular Specialists, states:

Mr. Lemmon is a 49-year-old gentleman with multiple
known coronary risk factors and prior document coronary
artery disease who went to St. John's emergency room
with a history of waxing and waning chest pain that
radiated to his neck in the several hours prior to his
presentation. This chest discomfort occurred at rest
while the patient was attending class at SMS. After he
reached the emergency room, the pain persisted and he
required several sublingual Nitroglycerin which was
then followed by IV morphine sulfate. The pain
initially abated but then recurred. There was a
constant pain that was present after he was transferred
to the telemetry floor. This persisted despite more
sublingual Nitroglycerin and IV Morphine Sulfate. The
patient was then transferred to the Coronary Care Unit
for IV Nitroglycerin therapy. He had already been
placed on IV heparin and 02 supplementation as well.
However, it should be mentioned that his serial
echocardiograms have shown no acute ischemic changes.
His serial cardiac enzymes have also shown no evidence
of new myocardial necrosis thus far. Nevertheless, he
has remained clinically and hemodynamically stable with
subsequent abatement of his chest pain after being
placed on IV Nitroglycerin and given IV Morphine
sulfate in the Coronary Care Unit. There have been no
dysrhythmias. Upon further questioning, the patient had
been doing reasonably well after his last cardiac
catheterization that was performed by Dr. John Hawkins
in March of this year. The study at that time showed
preserved overall left ventricular systolic function
with no significant segmental wall motion abnormalities
or mitral regurgitation. His previously stented regions
in the mid left anterior descending had a 30 percent
in-stent restenosis. His previously stented mid right
coronary artery was also patent but there was a 30
percent stenosis in the right coronary artery proximal
to the stented region. Otherwise no other significant
obstructive disease was found in the other coronary
vessels. There was a small ramus intermedius branch

55

> that was totally occluded with adequate collateral
> flow. With this finding, plaintiff was continued on
> optimal medical therapy. He denied progressively
> worsening symptoms with increased sublingual
> Nitroglycerin consumption prior to his event on the day
> of his admission. . . He has had a long-standing
> problem of peripheral edema that may be related to the
> vasodilatory effects of Nifedipine, which he takes for
> hypertension. There have been no other symptoms of
> palpitations associated with weakness, dizziness, near
> syncope or syncope. There have been no new transient
> ischemic attacks/CVA symptoms. He has had no recent
> problems with bleeding diathesis.

(Tr. 603).

Plaintiff related some decreased functional capacity

and fatigue prior to arriving at the hospital (Tr. 603). "At

least" 2+ pitting edema was noted in the bilateral pretibial

and ankle areas" (Tr. 602). A cardiac catheterization was

ordered (Tr. 601).

In a report of cardiac catheterization from the office

of Kelly Trygg, M.D., dated September 11, 2001, the

physician recorded an impression of:

1. Severe single vessel coronary artery disease with
   severe stenosis of the proximal right coronary
   artery and moderate stenosis of the mid right
   coronary artery

2. Mild in-stent restenosis of the mid right coronary
   artery and mid left anterior descending

3. Chronically occluded small intermediate ramus
   branch filled by collaterals

4. Normal left ventricular function

56

5.   No mitral insufficiency

(Tr. 486).

        Plaintiff was admitted to the St. John's Regional
Medical Center on September 11, 2001, with symptoms
consistent with unstable angina (Tr. 387-388). His serial
cardiac enzymes revealed no evidence of new myocardial
necrosis and serial ECG's failed to reveal obvious acute
ischemic changes. A cardiac catheterization was performed.
He was discharged to home on September 12, 2001, with
Isosorbide mononitrate, Plavix, and Sublingual
nitroglycerin.

        Discharge diagnoses were as follows:

        1.   Unstable angina.

        2.   Known coronary artery disease - cardiac
             catheterization (09/11/2001), shows normal
             ventricular function with no segmental wall motion
             abnormalities, normal left main, mild plaque in
             the left circumflex, totally occluded small ramus
             intermedius branch, 80% stenosis in the proximal
             right coronary artery, 25% instant restenosis, 50%
             tubular stenosis in the mid right coronary artery,
             and 30% instant stenosis in the mid left anterior
             descending; status post percutaneous coronary
             intervention with stenting of the proximal right
             coronary artery without complications
             (09/11/2001).

        3.   Hypertension.

        4.   Type II diabetes mellitus.

        5.   Dyslipidemia.

                            57

6.  Obesity.

7.  History of gastroesophageal reflux disease.

8.  History of hemorrhoids.

9.  Prior history of ETOH[22] abuse.

10. Status post cholecystectomy.

11. Status post carpal tunnel repair.

12. History of neuropathy

(Tr. 387).

On September 13, 2001, plaintiff went to St. John's Cardiovascular Specialists with a complaint of chest pain. He was status post stent placement of 48 hours. The physician stated: "These symptoms do not appear to be due to coronary ischemia. It may be due to his chronic reflux" (Tr. 596). Plaintiff was told to increase his Prevacid to 30 mgs twice daily for one week (Tr. 596).

Plaintiff was again admitted to St. John's Regional Medical Center on September 17, 2001, with a complaint of unremitting chest pain times for five days. On a discharge summary, the physician noted:

> The patient was admitted to a telemetry bed. Telemetry monitor was unimpressive. Blood pressure readings here were excellent. Blood sugars ran anywhere from 200 to the low 100 range. No hypoglycemia problems with

---

[22]ETOH stands for alcohol.

nausea, vomiting, or appetite while here. He was
started on Xanax therapy due to increasing anxiety and
restlessness. Stress test was unrevealing and Dr.
Merritt did not feel that this represented acute or
chronic ischemic pain. The patient just underwent
cardiac catheterization and angioplasty was done of the
proximal right coronary artery last week. It was
strongly felt that a lot of this had to do with
pressure related to his school anxiety and his anxiety
over his chronic medical problems.

(Tr. 389-390).

Plaintiff was discharged from St. John's Regional

Medical Center to home with additional prescriptions for

Glucophage and Xanax. He was instructed to continue all his

other medications. Discharge diagnoses were as follows:

1.    Essential hypertension

2.    Type 2 diabetes complicated by peripheral
      neuropathy

3.    Gastroesophageal reflux disease

4.    Hypercholesterolemia

5.    Atherosclerotic coronary artery disease

6.    Remote history of alcoholism

7.    History of major depression/anxiety

8.    Chronic back pain secondary to degenerative
      arthritis.

(Tr. 389).

A St. John's Regional Medical Center Nuclear Medicine

Consultation, dated September 18, 2001, documents the

59

results of a Cardiac Stress Test with Adenosine Provocation, Monitoring and Interpretation. A clinical impression was made as follows:

> Satisfactory pharmacologic stress in preparation for myocardial perfusion imaging. There was no electrographic evidence of an ischemic response.

(Tr. 384).

A St. John's Regional Medical Center Nuclear Medicine Consultation, dated September 18, 2001, documents the findings of a Radionuclide Myocardial Perfusion Spect/Rest Adenosine Wall Motion Ejection Fraction Evaluation. A clinical impression was made as follows:

> Very mild reversible/ischemic changes are present in the inferoapical area of questionable clinical significance and not substantially changed in comparison to the previous examination. Global left ventricular systolic function is similar to that noted on the previous study of 12/18/00. There is viable myocardium throughout the left ventricle.

(Tr. 385).

On October 26, 2001, plaintiff went to St. John's Cardiovascular Specialists and reported that he had suffered chest pain one week after his discharge from the hospital. The physician noted that he was still anxious and depressed and that he continued to suffer from chest pain. A note on the record states "No angina" (Tr. 591). Another note states, "drinking again - attempted arson" (Tr. 591).

60

Plaintiff was told to return to the physician in five months (Tr. 592).

Medical records from Cox Health Systems document plaintiff's admission and treatment to the Center for Addictions beginning on October 29, 2001. He had been sober for 2 1/2 years until he took Xanax. Plaintiff felt that the Xanax was directly related to his relapse. He went through treatment and was discharged on January 3, 2002, with the understanding that he would continue with After Care and AA meetings (Tr. 686-699).

On October 30, 2001, Kelly Trygg, M.D., wrote:

William has had a quite hard [sic] since I discharged him from the hospital a month ago. He has had a couple of alcohol binges and got intoxicated. Most recently he was involved with the law in an altercation at a little local Git N Go. He had previously, earlier that evening, had had a robbery attempt on him. He became delusional in his drunken state and took a gun and was shooting it in the air and tried to set fire to the Git N Go. No one was hurt but he was arrested and spent a week in jail. He now has a court date coming up in a couple of weeks. He has continued to have continuity with his psychologist and will reestablish with the psychiatrist, Dr. Garcia, but an appointment cannot be arranged until the end of December. He states that when I gave him the Xanax after he had left the hospitalization, he felt like he lost his inhibition to drink and therefore began to drink. He has been off the Neurontin for weeks. He had problems with Prozac in the distant past. I have never prescribed any psychotropics for him until the Xanax. He had been continuing to complain of chest pain and it was really recommended by his cardiologist who really felt that his chest pain complaints at this time were all related to anxiety. We

61

have worked his lungs up and worked his GI tract up and could find no discernible etiology for the chest pain. He is now off the Xanax and sober. He is reestablishing with AA and has had to dropout of school because of the work that he missed both in the hospitalizations in September and with the recent problems.

He does bring a current list of his medications and his blood sugars have finally started to improve. They are now within the high 100 range as opposed to over 200. He reports no complaints or problems with the Glucovance which is the newest medication.

He is still having his chest pain. He saw his cardiologist today who made no changes in the medications and he wanted to see him back again in six months. He reports no interval medical history.

IMPRESSION:

1.    Anxiety/depression.

2.    Alcoholism.

3.    Diabetes mellitus still under suboptimal control but better.

PLAN: He requests a refill on his Zantac for the acid reflux and we wrote a script for that. See letter dictated on his behalf to the University. He also wanted me to mention in the medical record that when he was handcuffed for several hours he had a lot of pain and swelling of the left land. He now has lost the sensation on the dorsal surface of the left hand. The fingers are fine and there is no loss of strength. You can see the indentation mark still there from where the handcuff rubbed on his wrist. I want to see him back in two months or sooner prn [as needed]. I do not have any other thoughts at this time except I will await to hear from his psychologist because I think we need to get him back on some Neurontin or an antidepressant. We will hopefully get some direction from her or preferably maybe she can pull some strings and get him in with Dr. Garcia sooner. I encouraged him to continue with AA.

62

(Tr. 485).

A letter from Kelly Trygg, M.D., to SMSU, dated October 30, 2001, states:

> [Plaintiff] has multiple medical problems for which I have been following him now for nearly two years. He has been recently hospitalized several times and we are in the process of getting specialists involved for medication changes and other changes in his treatment plan. Because of his persistent problems, I have recommended that he drop out of his classes immediately so that we can get a better handle on things at the present time.

(Tr. 483).

On December 31, 2001, lab results from the office of Kelly Trygg, M.D., document a fasting glucose level of 150 (Tr. 497). Plaintiff reported to the physician on this date that he had suffered two hypoglycemic reactions since his previous visit. He admitted to erratic eating habits, but it was noted that he was tolerating the Glucovance well. Plaintiff reported that he was attending AA meetings and had enrolled in two college courses. Plaintiff also reported an increase in palpitation with the discontinuation of the Toprol. His blood pressure was 130/90. The physician assessed that his diabetes was still under suboptimal control but that it was better. Toprol was re-started (Tr. 482).

On February 1, 2002, plaintiff saw Dan Park, D.P.M., and was diagnosed with partial re-growth of the left hallux nail. Plaintiff was upset that the nail was coming back and refused any of the suggested treatment, stating that he would find another podiatrist on his own (Tr. 649).

On March 14, 2002, Kelly Trygg, M.D., noted that plaintiff's blood sugars were controlled, based on the recent tests at the clinic (Tr. 480).

On April 8, 2002, plaintiff went to St. John's Cardiovascular Specialists and reported that he had some minor chest pains, but that he did not need nitroglycerin for them. The physician ordered a stress test to rule out angina (Tr. 589-590).

A letter from John W. Hawkins, M.D., F.A.C.C., found in the records of Kelly Trygg, M.D., dated April 8, 2002, states:

> [Plaintiff] is in the office today in follow-up of her [sic] coronary artery disease, hypertension, diabetes, hypertriglyceridemia, and previous chemical dependence. He does have occasional left-sided chest discomfort which is dull and lasts about 30 minutes. It does not correlate well with exertion. He has not required sublingual nitroglycerin.
>
> This may well be anginal discomfort. It could be related to his occluded intermediate branch that fills by collaterals, but we need to rule out re-stenosis of his RCA stent.

I arranged an adenosine Cardiolite scan to try to
locate and quantify ischemia. He will call for any
worsening of his symptoms.

As you recall, his chest discomfort has been somewhat
difficult to sort out in the past. Soon after his stent
was placed, he required repeat angiography, but at that
point, there was nothing new with his coronary anatomy.

(Tr. 637).

A nuclear medicine consultation, dated April 17, 2002,

from the records of St. John's Cardiovascular Specialists,

documents the findings of a cardiovascular stress testing

with adenosine provocation, monitoring, and interpretation

as follows:

The patient had a nonischemic electrocardiographic
response to Adenosine infusion. No arrhythmias were
induced during the procedure.

(Tr. 586).

A nuclear medicine consultation, dated April 17, 2002,

from the records of St. John's Cardiovascular Specialists,

documents the findings of a radionuclide myocardial

perfusion spect/rest adenosine wall motion ejection fraction

evaluation as follows:

There is no obvious evidence for a critical coronary
artery stenotic lesion leading to reversible ischemia
on this examination. There is normal wall motion and
left ventricular ejection fraction at rest. The
previous examination of 9/18/01 demonstrated
questionable inferoapical reversible ischemia. This was
not evident on today's study. The previous LVEF was
50%.

65

(Tr. 587).

On May 30, 2002, Dr. Hubler from the Ozark Foot Clinic diagnosed plaintiff with onychomycosis of the left great toe and hyperkeratosis of the bilateral heels. He was given two prescriptions for Lac-Hydrin 12% lotion and Penlac (Tr. 622).

A report from the Foot Clinic, dictated on June 19, 2002, located in the records of Kelly Trygg, M.D., reflects that plaintiff denied any abnormal sensations in his feet and legs. He did stated that if he had pain, it was a 3 to 6 on a scale of 0-10 and that Neurontin decreased the pain (Tr. 639).

A June 27, 2002, preliminary examination, located in the records of Kelly Trygg, M.D., reports that plaintiff had enough subjective complaints and symptoms to justify ordering the sleep study. A 1+ edema distal edema was found on examination (Tr. 629).

On June 28, 2002, plaintiff went to Kelly Trygg, M.D., and reported that he had been off his insulin since the previous October. He reported that, overall, he felt pretty good. His blood pressure was 150/86. No significant peripheral edema of the ankles or feet was found. The

66

physician ordered a metabolic panel and an A1c[23] (Tr. 647).

In a letter to plaintiff, dated July 8, 2002, Kelly Trygg, M.D., noted that plaintiff's blood sugar had come back as 202 and his hemoglobin A1c was 8.6%. He was instructed to return to 50 units of insulin at bedtime (Tr. 635).

The results of a polysomnography study done on July 11, 2002, located in the records of Kelly Trygg, M.D., revealed "severe obstructive sleep apnea syndrome (780.53-0) with improvement using nasal CPAP [continuous positive air pressure] at 12 cm. of water pressure" (Tr. 626).

According to the records of Kelly Trygg, M.D., plaintiff went for a hearing evaluation on July 26, 2002. He had previously complained of tinnitus (ringing in the ear). An audiogram revealed only very mild hearing loss bilaterally. Kelly Trygg, M.D., suggested that some of plaintiff's medications or the amount of caffeine he consumed might be causing the tinnitus (Tr. 628).

In a letter to Kelly Trygg, M.D., dated August 13, 2002, Paul Knick, O.D., states that plaintiff had no signs

---

[23]Hemoglobin A1c is a blood test that shows the average level of glucose in the blood during the last three months. This test is the most accurate way of knowing how well a diabetes treatment program is working.

67

of diabetic retinopathy (Tr. 625).

On October 10, 2002, Kelly Trygg, M.D., ordered a functional work assessment from physical therapy (Tr. 682).

A Physician's Statement for Disabled Plates by Kelly Trygg, M.D., dated October 25, 2002, indicates that plaintiff was eligible for temporary disability plates until April 25, 2003 (Tr. 615).

On November 14, 2002, plaintiff called the office of Kelly Trygg, M.D., and reported that his leg was starting to go numb due to his back and that the ringing in his ears and dizziness was getting worse (Tr. 644).

On November 20, 2002, it is recorded in the records of Kelly Trygg, M.D., that a referral to the Pain Clinic was made for evaluation of the leg numbness (Tr. 643).

On November 22, 2002, an ENG was ordered by St. John's Ear, Nose, and Throat Specialists, after plaintiff complained of dizziness and increased tinnitus. Physical examination on this date was unremarkable (Tr. 678).

On December 26, 2002, Plaintiff went to Curt Evenson, M.D., and reported that he had low back pain which was occasionally so severe that he could not walk. He complained of pain along the right lower lumbosacral area that radiated down in the leg causing numbness in the right anterior thigh

68

to the knee. Plaintiff reported an increase in the pain during the previous six weeks. He had difficulty coming upright. On examination, the physician wrote:

> No abnormal curvatures. No stepoffs are palpated. He has no apparent increase in muscular tension. He can flex forward fully with ease. Extension does not create pain. Lateral bending to the right does create some mid-back pain off to the right side. Lateral bending to the left is unimpeded. On palpation, his only real area of tenderness appears to be over the right sacroiliac joint over the superior aspect of it. . . .  Mild swelling in the feet. . . .  Hips and knees move well without pain. . . .  Brisk reflexes 2/4 in knees and ankles. Motor strength testing is 5/5. Sensory examination shows a distal hypoesthesia in the feet.

(Tr. 719-720).

The physician recommended physical therapy rather than steroid injection because of plaintiff's diabetes (Tr. 720).

A Medical Source Statement-Mental from Nicodemus Garcia, M.D., dated December 30, 2002, assessed that, separating the alcohol addiction, plaintiff was moderately limited in the ability to:

- Perform activities with a schedule, maintain regular attendance and be punctual within customary tolerances.
- Work in coordination with or proximity to others without being distracted by them

- Accept instructions and respond appropriately to criticism from supervisors.

(Tr. 710-711).

On January 20, 2003, plaintiff went to Gary Highfill, M.D., St. John's Ear, Nose, and Throat Specialists, and reported that the tinnitus started after meals. A review of the ENG revealed a unilateral weakness on the right on the caloric testing. The physician assessed that plaintiff appeared to have a "unilateral weakness with lightheadedness consistent with endolymphatic hydrops." Plaintiff was instructed on a low sodium diet and was given a referral to a dietician (Tr. 723).

A St. John's Regional Health Center x-ray of the lumbar spine, performed on January 21, 2003, to evaluate a complaint of leg numbness, revealed:

1. Degenerative disc disease at L3-4, not significantly changed.

2. Degenerative facet joint changes, lower lumbar spine, similar in appearance when compared to 4/28/00.

3. Further evaluation with MRI lumbar spine may be considered if warranted.

(Tr. 771).

An x-ray of the lumbar spine, from the records of Curt Evenson, M.D., dated January 21, 2003, revealed "[m]oderate degenerative facet joint changes affect the lower lumbar spine. Moderate disc space narrowing is seen at L3-4. No fracture or destructive osseous lesion is seen. No

70

sublaxation." (Tr. 717).

A note from the records of Curt Evenson, M.D., dated
January 22, 2003 states:

> The patient returns today. He had a follow-up
> appointment but he was supposed to be starting therapy
> before then, and he has not followed through with this.
> Supposedly he has an appointment with them tomorrow. We
> do have the x-rays of his back, though. Really his back
> does not show any significant degeneration. He has a
> little bit of L3-4 degenerative disc disease,
> otherwise, everything else looks pretty benign. My
> suggestion is to continue with therapy and then we will
> follow-up with him after this.

(Tr. 716).

Plaintiff went for individual therapy at Burrell
Behavioral Health five times between January 23, 2003, and
October 9, 2003 (Tr. 759-763).

Medical Records from Shawn McIntire, M.S., and Brent
Bolyard, M.D., dated February 3, 2003, include three pages
of an eight-page report for a CPRC Initial Assessment. The
following impressions and recommendations were documented:

> Bill is a 51 year-old male with a history of mental
> illness. It is recommended that Bill participate in the
> CPRC program and receive community support services.
> His community support worker can ensure that Bill's
> physical and mental health needs are met, encourage him
> to remain medication compliant, offer him a support
> system, help maintain his current level of functioning,
> encourage him to participate in any social and
> recreational activities he may choose, and coordinate
> and ensure provision of needed services and resources.
> Bill's goals include continuing his education and
> "getting better mentally." His CSW can assist Bill with

71

planning and meeting objectives to achieve these goals, and any others he may set for himself. Bill needs to be referred for dental work, and a referral for this can be made and monitored by his CSW. Bill appears to have fair insight into his illness. He does appear to realize the importance of being medication compliant for his stability, and reports no history of non-compliance with medications. It is questionable whether he realizes the importance of having the support and encouragement of his treatment team available to him, and whether he would access this support when needed. It is recommended that Bill continue to attend AA meetings on a regular basis, and continue to access the support these provide him. He should continue to follow the requirements of his legal probation, meet with his probation officer on a regular basis, and attend Mental Health Court as required. Bill should continue to see his community support worker on a regular basis, to discuss any issues or problems he may be having. He expresses a desire to see a therapist, and a referral for this can be made and monitored by Bill's CSW. Bill should continue to see Dr. Garcia for psychiatric services and medication management on a regular basis, and follow all treatment and medication recommenda-tions. Given Bill's reported September 2001 psychiatric admission, and his current probation status, a Critical Intervention and Alert Plan should be in place at this time.

(Tr. 757-758).

Plaintiff reported that he enjoyed carpentry and metal work, computer related activities, and that he tutored people in computer work. His social contacts included people at AA and his AA sponsor (Tr. 757). Plaintiff reported that he was able to do his own personal hygiene care. He denied any problems with mobility. Plaintiff reported that he was able to do grocery shopping and meal preparation and that he

followed his diabetic diet accordingly. He did admit that he
had trouble keeping the house clean, but he did all the
chores without outside assistance. It was noted that
plaintiff had completed four years of college, but did not
have a degree. (Tr. 756).

In a February 3, 2003, clinical assessment from the
Department of Mental Health there is a list of plaintiff's
medications which included Actos, Prandin, Glucovance,
Toprol, Isosorbide, Nitrostat, Nifedipine, Diovan HCT,
Aspirin, Diclofenec, Klor-Con, Torsemide, Lipitor,
Ranitidine, Prevacid, and Cyclobenzaprine (Tr. 765).
Plaintiff spoke of feelings of depression and anxiety. He
stated that the depression occurred on a weekly basis and
lasted all day. The anxiety was occurring five to six times
daily (Tr. 766). A diagnosis was made of:

      Axis I:   Major Depressive Disorder, Recurrent,
                Moderate . . .

      Axis III: Type II Diabetes, Angina, Hypertension,
                Osteoarthritis, Edema, Hypercholesterolemia,
                Acid Reflux Disease

      Axis IV:  Problems with family, mild Problems with
                social network, mild Occupational problems,
                moderate Economic problems, severe Legal
                problems, moderate Problems with daily living
                skills, moderate

      Axis V:   Current GAF:53 Highest GAF: 53

73

(Tr. 767).[24]

A Handicap License Plate Permit, completed by Kelly Trygg, M.D., on February 4, 2003, reflects that the physician completed the permit by marking that plaintiff was eligible for a permanent disability plate/placard (Tr. 714).

Plaintiff was evaluated on February 13, 2003, by physical therapy on referral from Dr. Evenson at the Pain Clinic. The report indicates that:

> The patient reports that the accident associated with his injury was on 06195 at work; this has been settled with Work Comp. He was lifting a 55-gallon trash drum and it slipped and he grabbed it and it wrenched his back. He reports that his biggest concern is numbness that is new within six months on the right lateral thigh hip to knee. He has had physical therapy upstairs in the summer of 2000. He reports that sometimes he has flare-ups and sometimes it is dormant. When he is flared up, he cannot walk and he starts having difficulty walking and starts hobbling. He indicates pain in the right hip and groin. He reports no incident created the flare-up the last time. If he becomes overactive, he occasionally flares up. He reports his back x-ray revealed degenerative bone disease. He reports when Dr. Evenson moved his hip the first time he noticed he had some right hip problems. He cannot stand very long, he cannot sit very long. Sitting increases his numbness and standing increases his pain. He is presently a senior student at Drury. His sitting and typing at the computer do increase his problems. He reports as part of his lifestyle in the past he was very active including racing motorcycles, doing a lot of heavy lifting, surfing in California and playing football.

---

[24]A GAF of 53 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning.

74

(Tr. 775).

After evaluation, the therapist made the following assessment:

> The patient is a large gentleman who tends to be very muscular and stiff. His right Sl joint is elevated relative to his left and also anterior. He does have decreased active range of motion primarily in side bending to the right. He also has some SI joint dysfunction on the right side. His right hip is a little stiffer than his left; however, has more symptoms of pain on the right than the left. However, hip range of motion is very similar. One leg stand poor trunk stability on the right. Abdominals are generally poor, abdomen is large. Hamstrings are very tight and IT band on the right is tight. Patient should benefit from physical therapy with focus on increasing trunk stability and improving segmental mobility of thoracic back, balancing muscles of the lower extremities.

(Tr. 776).

A February 20, 2003, medical record from the Ferrell Duncan Clinic reflects a work status form on which Michael Grillot, M.D., wrote a working diagnosis of "writer's cramp" and restricted plaintiff to no more than 10 minutes of writing. He recommended a computer if more time than that was needed (Tr. 725).

Plaintiff went three times between March 3, 2003, and March 13, 2003, to Dr. Evenson at St. John's Regional Health Center. On March 3, 2003, plaintiff went to St. John's Regional Health Center and complained of continued pain in the right side of his lower back with numbness in his legs.

75

Physical therapy had not benefitted him after two sessions.
He was scheduled for an epidural injection (Tr. 781). The
epidural injection was performed on March 7, 2003 (Tr. 782).

On March 13, 2003, plaintiff went to St. John's
Regional Health Center and reported considerable improvement
in his pain and rated it a 1-4/10, but primarily just a 1.
He complained mostly about the diabetic neuropathy in his
feet and as a result, the physician increased his Neurontin
to 1800 mgs daily (Tr. 783).

On June 12, 2003, plaintiff went the offices of Scott
Rousch, D.O., and Boyd Southwick, D.O., for initial
assessment. He had no complaints and denied changes in
vision or hearing, dyspnea, or chest pain (Tr. 751). A CBC,
CMP, HgbA1-C, and Lipid Panel were ordered (Tr. 752).
Plaintiff was given a refill for Lipitor.

Lab results from the records of Scott Rousch, D.O., and
Boyd Southwick, D.O., dated June 12, 2003, revealed a HgbA1c
of 7.3% (Tr. 744); triglycerides of 654 and cholesterol of
373, (Tr. 745); and glucose of 143 (Tr. 746).

Plaintiff went to the offices of Scott Rousch, D.O.,
and Boyd Southwick, D.O., on July 10, 2003, and reported
that he had been increasingly depressed and unmotivated to
work or finish school. He was to have surgery for sleep

76

apnea and was hopeful that this would help his other medical problems. Physical examination was unremarkable. The physician diagnosed anxiety, depression, sleep apnea, hypertension, hypercholesterolemia, and diabetes mellitus, Type 2, controlled (Tr. 742).

A Nuclear Medicine Consultation, located in the records of St. John's Regional Health Center, dated July 21, 2003, documents the findings of a radionuclide myocardial perfusion spect rest/stress wall motion ejection fraction evaluation as follows:

> There was no obvious evidence for a critical coronary artery stenotic lesion leading to reversible ischemia on this examination. There is normal wall motion and left ventricular ejection fraction at rest. The previous examination of 4/17/02 demonstrated virtually identical imaging findings. The LVEF [left ventricular ejection fraction][25] on the previous examination was 64%.

(Tr. 793).

A Nuclear Medicine Consultation, from the records of Joel Waxman, M.D., dated July 21, 2003, documents the findings of a Cardiovascular Stress Test with Adenosine Provocation, Monitoring, and Interpretation as follows:

---

[25]Ejection fraction is calculated by dividing the volume ejected from a ventricle by the volume of blood in the ventricle after filling.  Healthy individuals typically have ejection fractions greater than 55%.

77

> The patient had a nonischemic electrocardiographic
> response to the adenosine infusion. No arrhythmias were
> induced during the procedure.

(Tr. 796-797).

A discharge summary, from the records of Joel Waxman,

M.D., for a hospital admission from July 25, 2003, to July

27, 2003 (Tr. 798-805), states that plaintiff underwent a

tonsillectomy, uvulopalatopharyngoplasty, and radiofrequency

to the base of his tongue in an attempt to reduce his sleep

apnea (Tr. 805).

According to the records of Joel Waxman, M.D.,

plaintiff went to the emergency room by ambulance on July

29, 2003, complaining of difficulty breathing (Tr. 816). It

was noted that he was in no apparent distress and that his

respiration was even and unlabored (Tr. 817). A chest x-ray

was normal (Tr. 820-821). He was discharged to home with a

diagnosis of sleep apnea and was instructed to use his CPAP

machine[26] at night and to follow up with Dr. Waxman (Tr.

---

[26]A continuous positive airway pressure (CPAP) machine
is a simple respiratory ventilator used mainly by patients
at home, for the treatment of sleep apnea. In sleep apnea,
the patient's airway becomes restricted as the muscles relax
naturally during sleep, which causes arousal from sleep. The
CPAP machine stops this phenomenon by delivering a constant
stream of compressed air via a mask, which splints the
airway, allowing the patient to breathe freely. The CPAP
machine blows air at one set pressure (called the titrated
pressure), usually programmed into the machine by the sleep

815).

Plaintiff went to the offices of Scott Rousch, D.O., and Boyd Southwick, D.O., on August 13, 2003, for follow-up. He reported that he was still having pain from his surgery. A stress test done one week prior to the surgery was normal. Plaintiff reported persistent edema, dizziness, and chronic chest pains brought on by stress and exertion (Tr. 739). 1+ edema was noted in the lower extremities (Tr. 740). Plaintiff requested and was given a letter to excuse him from school for the semester (Tr. 755). He was given a refill of hydrocodone, and Nifedipine was discontinued (Tr. 740).

On August 27, 2003, Joel Waxman, M.D., noted that plaintiff was sleeping better. A second radiofrequency to the tongue was scheduled (Tr. 795).

On November 10, 2003, plaintiff went to Dr. Evenson. He stated that the 1,800 mgs of Neurontin had improved his pain. The numbness was persistent. Examination was unremarkable and the physician continued him on the Neurontin at the same dosage (Tr. 826).

---

physiologist. The titrated pressure is an average reading from a titration study, and is usually measured in centimeters of water cm/H20.

## C. *SUMMARY OF TESTIMONY*

The administrative hearing was held before the Honorable Arthur T. Stephenson, Administrative Law Judge, on December 5, 2002, in Springfield, Missouri (Tr. 830-886). Appearances were made at that hearing by plaintiff, Bruce Kirby, plaintiff's attorney, and Dr. Cathy Hodgson, a vocational expert (Tr. 830).

### 1. Plaintiff's Testimony

Plaintiff testified that he was 50 years old on the date of the hearing (Tr. 836-837). He testified that he was 6 feet tall and weighed 278 pounds, which was his normal weight. He testified that he was right handed. He testified that he was single and lived alone in a one-bedroom apartment (Tr. 837).

Plaintiff testified that he did the housework and grocery shopping. (Tr. 837). He testified that he cooked, but not very often (Tr. 838).

Plaintiff testified that he was a student at SMSU and went to AA meetings over his lunchtime. He testified that he had recently become a sponsor of another attendee. He testified that he stayed active in the recovery community (Tr. 838).

Case 6:04-cv-03461-REL  Document 21  Filed 03/31/06  Page 80 of 120

Plaintiff testified that he had not had a drink since October 13, 2001, so this was not a consideration in his ability to work. He testified that prior to March, 1999, it had been an issue (Tr. 839).

Plaintiff testified that he had a driver's license and drove the SMSU every day (Tr. 840).

Plaintiff testified that he was a senior, but had changed his major the previous year and so had at least four semesters left. He testified that he was making passing grades and that his intended major was Technical Writer (Tr. 840).

Plaintiff testified that he was unable to work due to depression, personality disorders, anxiety attacks, and nervous breakdown. Additionally he testified that he suffered from heart problems, shortness of breath, fatigue, back problems, knee problems, bilateral carpal tunnel syndrome, impingement of a nerve in his right hand, ankle swelling, and diabetic neuropathy of the feet. He testified that he also had intermittent numbness in his leg (Tr. 841).

Plaintiff testified that he had a 2.98 grade average. He testified that, even though he was making good grades, his pain did interfere with his ability to concentrate and maintain persistence and pace (Tr. 841). Plaintiff testified

81

that he had suffered a series of anxiety attacks in October
of 2001, causing him to have to withdraw from the university
because of health reasons. He testified that he had been
enrolled in 12 credit hours at the time and that his maximum
level was about six to nine credit hours. He stated that he
was currently enrolled in seven credit hours (Tr. 843).
Plaintiff testified that he was going to college on Pell
grants, loans, and other grants (Tr. 843).

Plaintiff testified that he had gotten into some severe
legal difficulties as a result of being prescribed Xanax for
anxiety in 2001. He testified that he had shot a gun at a
local convenience store and tried to set some gasoline on
fire (Tr. 843).

Plaintiff testified that Kelly Trygg was his treating
doctor and that Dr. Garcia was his psychiatrist (Tr. 844).

Plaintiff testified that he was not going to Burrell
for counseling because he was going to have a case worker
assigned under the jurisdiction of the Mental Health Court
as a result of the October 2001 incident for which he had
plead guilty and received probation (Tr. 845).

Plaintiff testified that Dr. Park had been his
podiatrist. He testified that he had fired Dr. Park because
the physician had not removed his toenail completely and it

had started to grow back (Tr. 847-848). He testified that Dr Huebler was his podiatrist at the time of the hearing and that he received regular diabetic foot care at the Foot Clinic (Tr. 848-849).

Plaintiff testified that he had worked as a professional alignment frame mechanic for 25 years. He testified that 1983 to 1986 and from 1988 to 1994, he had owned his own shop (Tr. 850). He testified that in between owning his own shop, he had worked for a body shop doing frame and wheel alignment. He testified that he had lost his Worker's Comp insurance and had gone bankrupt in 1994 (Tr. 851). He testified that he was a "working alcoholic" at the time (Tr. 852). He testified that the drinking had nothing to do with his bankruptcy, but that he had five worker's comp claims in a year and a half, and his insurance carrier had dropped him. He testified that he could not afford to get another carrier because of their rates (Tr. 852). He did testify that, had he not been drinking, perhaps he could have avoided two of those claims, which he considered to be fraudulent, by getting along better with his employees (Tr. 853).

Plaintiff testified that he had spent the previous summer helping his father rebuild a barn. He testified that

83

they would work five to ten minutes and sit down for five to ten minutes. He testified that his productivity was 1/10 what it used to be because of all his ailments (Tr. 855).

Plaintiff testified that he had been to the emergency room with complaints of back pain. He testified that he had suffered a work-related accident in 1995 (Tr. 855).

Plaintiff testified that he had been a resident of Missouri since 1996. (Tr. 855). He testified that between 1994 and 1999 he had worked as an auto mechanic and frame straightener (Tr. 856).

Plaintiff testified that Exhibit B-3E accurately listed and described his past relevant work (Tr. 856-858).

Plaintiff testified that he had moved to Missouri in 1994, and had continued to manage the shop in California over the phone for about five months while being employed by Reliable Chevrolet in Springfield (Tr. 858-859).

Plaintiff testified that he had gone to Lake's Country for evaluation in July of 1999, and that they had suggested he pursue a career as a claims adjuster. He testified that he had originally worked at SMSU towards the business degree needed for that (Tr. 859). He then testified that he did not need a degree to be a claims adjuster, but that he did not think he would be employable as an insurance adjuster, but

84

would like to do some specialized adjusting and forensic reporting (Tr. 860). He testified that his counselor at vocational rehabilitation thought it would be very hard to get a job as an adjuster because he was a felon (Tr. 861).

Plaintiff testified that he had not been able to keep up with the demands of pursuing the business degree. He testified that the stress of it had led to his breakdown, which in turn led to the Xanax being prescribed, which led to his legal problems (Tr. 861).

Plaintiff testified that he had panic attacks once every couple of weeks, for which he was prescribed Paxil. He testified that he was not certain if the Neurontin helped the panic attacks or not. He testified that he had also cut back the hours he was taking at school to reduce the anxiety (Tr. 862-863). Plaintiff testified that he had suffered a debilitating panic attack in June of 2001 that had put him in bed for a day and a half (Tr. 864).

Plaintiff testified that he had some special accommodations at school for his physical and emotional problems. He testified that he was allowed to have additional time to test and could tape record lectures (Tr. 864). Plaintiff testified that he had received a letter from SMS on Tuesday stating that he was expelled if he made any

85

professor uncomfortable in any way. He testified that he had a tendency to have a threatening attitude when discussing his grades with professors (Tr. 865).

Plaintiff testified that his heart problems interfered with his ability to attend school. He testified that he had chest pains on a daily basis and that he carried nitroglycerin with him for use as needed. He testified that he took isosorbide with nitroglycerin in it for time release medication. He testified that he had chest pain severe enough to interfere with his concentration, lasting about five to ten minutes, about twice a week (Tr. 867- 868). He testified that an occluded cardiac branch was probably the source of his angina. Plaintiff testified that he got short of breath and was tired (Tr. 868).

Plaintiff testified that Dr. Trygg had prescribed Flexeril for his back and leg problem. He testified that he took it on an as-needed basis. Plaintiff testified that he occasionally had pain so bad that he was unable to walk, but other times, it just interfered with his daily activities (Tr. 868). Plaintiff testified that he had to take Flexeril about once a month for a two to three day period. He testified that during that time, his ability to attend class was limited and that he had missed classes because of it

86

(Tr. 869). Plaintiff testified that he spent those two to three days on the couch (Tr. 870).

Plaintiff testified that his blood sugars were not checked daily because his last A1c test showed that, although they were high, they were within acceptable levels (Tr. 870). He testified that several doctors had told him that he had neuropathy. He testified that his feet hurt and that the Neurontin helped this (Tr. 870).

Plaintiff testified that he took medication for hypertension and that his blood pressure was under control (Tr. 871).

Plaintiff testified that he had been diagnosed with sleep apnea in the summer of 2002. He testified that he had a C-PAP machine but had not yet used it because when he had used it in the past, he had not been able to sleep. He testified that he was waiting until the semester was over to get used to it. He testified that he did not have problems with going to sleep involuntarily during the day (Tr. 871).

Plaintiff testified that he had never had seizure disorder, but that a "quack" doctor had told him he did (Tr. 872).

Plaintiff testified that he had problems in his feet on his left, great toe, both heels, the ball of his left foot,

on the sides, and calluses on both great toes that broke open (Tr. 872). Plaintiff testified that he saw a podiatrist on an as-needed basis (Tr. 873).

Plaintiff testified that, on a good day, he was able to walk several hundred yards and on a bad day, 50-100 yards. He testified that some days he was not able to walk at all (Tr. 873). Plaintiff testified that he was able to stand for five minutes before it took extreme effort to remain standing (Tr. 873). Plaintiff testified that he had to get up and move around in his classes to relieve pain and numbness. He testified that he was able to sit with his legs down for 20 to 30 minutes (Tr. 873).

Plaintiff testified that he was sometimes able to pick up a suitcase and that at other times, he could not pick up a gallon of milk because of the nerve impingement in his right hand. He testified that he had carpal tunnel surgery on both hands. He testified that he did not have carpal tunnel symptoms in his right hand, but that he still had symptoms in his left hand. He testified that Dr. Grillot wanted to do more nerve studies on the left hand. Plaintiff testified that he had difficulty with the left hand when playing his guitar and typing on the computer. He testified that he could type for five to ten minutes before having to

88

take a break of five to ten minutes (Tr. 875).

Plaintiff testified that he had seen Dr. Garcia since January of 2000. He testified that Dr. Garcia's diagnoses were depression and anxiety. Plaintiff testified that his emotions interfered with his ability to perform in classes. He testified that an example of this was the incidents with the professors when he was trying to discuss his grades. He testified that, on a daily basis, his depression interfered with his ability to get things done, and that some days, nothing got done because of it. He testified that about twice a month, he was so depressed that he would lie on the couch or stay in bed (Tr. 876).

Plaintiff testified that his personality disorder would interfere with his ability to work. He testified that he was not aware of where the line was between being assertive and intimidating (Tr. 877).

Plaintiff testified that he had recently been having bouts of dizziness and nausea. He testified that he had an EMG scheduled with an ear, nose, and throat physician to evaluate this (Tr. 878).

Finally, plaintiff testified that he used cocaine and methamphetamine in the past, but has not used those drugs for about 15 years (Tr. 882).

89

## 2. Vocational Expert

Cathy Hodgson testified as a vocational expert (Tr. 879).

The vocational expert testified as follows regarding Mr. Lemmon's past relevant work:

A:   Yes, sir. I'll use DOT terminology for some ease of review. Claimant has done work as an auto mechanic, his specialty, of course, wheel alignments, under body work. He performed that work between the medium and heavy level at several different locations. Generally, in the national economy, that's a skilled position and is performed at the medium level of exertion. His work as an owner of the auto shop would be considered a manager of automotive services by the DOT. He performed the work at a medium level, generally skilled and light, as performed in the national economy. He obviously did more of the work himself than the DOT would consider necessary to perform that job. That's all, sir.

Q:   Any transferable skills?

A:   He's going to have several different skills that we can look at. He's -- mechanical tools and he'll have the skills of that trade in terms of reading and doing precision work. From his work as a manager or owner, he would also have the ability to direct and control and plan, deal with people.

Q:   Okay. We talked about, in another matter, on primary and secondary skills. As auto mechanic, the primary skills would be what?

A:   His mechanical skills --

Q:   His mechanical skills?

A:   -- his ability to use those tools of his trade.

90

Q: They would be pretty well industry specific, wouldn't they?

A: Yes, sir, they would.

Q: And you mentioned that his writing, the technical writing he did has been published but that was published in an automobile mechanic -

A: Technical journal, yes, sir.

Q: -- publication. All right. Now, then, as the owner/manager -- well, would there be any secondary skills from the auto mechanic's job?

A: Certainly, the ability to make judgments, that kind of thing but those are going to be not so much -

Q: Kind of generic?

A: Yeah. Not in terms of the transferability.

Q: All right. How about owner, manager of the auto shop?

A: There, I would consider his major issues to be -- so he was a working manager so he still had to utilize the mechanical skills and trades but also the ability to direct, control and plan activities, deal with people and make business judgments commensurate within his mode of operation.

Q: What kind of judgments did you say?

A: Business judgments.

Q: Business judgments?

A: Yes, sir.

(Tr. 880-882).

The vocational expert was then examined by the attorney as follows:

> Q:  I'd like for you to assume someone of the Claimant's age, education and past work experience who, because of physical impairments, would miss work, be unable to work at a rate of two to three times per month and ask you whether or not -- two to three days per month -- could such a person return to the past relevant work of the Claimant?

> A:  Mr. Kirby, I'm going to give you an opinion based on my own vocational observation, not the DOT or any other necessary standard. It is my opinion that two to three days per month is outside of what would be considered normal leave days. Generally, industry provides up to 1.75 days per month leave, two to three days is going to be in excess. Over time, I think such an individual would have the incapacity of performing in the job center or as we usually do in the economy. Two to three days is too far out.

> Q:  All right. Based upon the testimony of the Claimant, if we were to assume an individual of the Claimant's age, education and past work experience who would have marked limitations in social functioning and frequent or marked limitations as those that are used in psychiatric review technique forms and concentration, could such an individual return to the past relevant work of the Claimant?

> A:  In concentration and social functioning only –

> Q:  Right?

> A:  -- but marked?

> Q:  Marked, uh-huh?

92

A: Could not return to the auto shop owner. Auto mechanic, at a skill level, in my opinion though, could not return because of the necessity to concentrate.

Q: Would there be other work available to this individual?

A: Certainly, with social function limitations, there's other work. When we have -- the only category of review I have is marked concerns and concentration. I might need a little more information available to give you that.

Q: Let's say that such would mean that -- I'm going to give you a definition of marked.

A: Thank you.

Q: All right. Marked in this hypothetical means the individual would not be able to perform 15 percent of the time so he would not be able to perform a job six hours out of 40 on a weekly basis.

A: Even at the unskilled level, individuals must be able to perform work at a work station -

Q: Right.

A: -- we're going 15 percent -

Q: Right.

A: -- and cannot perform at all?

Q: They're not able to perform the job.

A: I would suggest that such an individual would have difficulty maintaining work, could not work. . . . There's nothing in the DOT that would define that, Your Honor. That would be my personal opinion on it.

(Tr. 882-885).

Case 6:04-cv-03461-REL   Document 21   Filed 03/31/06   Page 93 of 120

## V.    FINDINGS OF THE ALJ

The decision of the Honorable Arthur T. Stephenson, Administrative Law Judge, is dated August 13, 2003 (Tr. 14-29).

The Administrative Law Judge evaluated the medical evidence as follows:

> With reference to the claimant's allegations of disability due to physical impairment, a review of the record provides the evidence the Office of Disability Determinations, on March 7, 2001, referred the claimant to Charles J. Ash, M.D., for consultative evaluation (Exhibit B8F) . . . . Following this examination, the record documents the claimant was provided the following diagnostic impression: Probable generalized degenerative arthritis. (Tr. 18-19).

> For the period October 2001 through April 7, 2002, the record fails to provide evidence of any ongoing care and/or rendered the claimant by an accepted medical source relative to chest pain and/or cardiovascular impairment. (Tr. 21).

> The record subsequent to April 2002, fails to provide evidence of any ongoing care sought and/or rendered the claimant by an accepted medical source relative to any cardiovascular impairment (Tr. 21).

> For the period February 24, 2001 through January 31, 2002, the record fails to provide evidence of any ongoing care sought and/or rendered the claimant by an accepted medical source relative to problem with his foot (Tr. 22).

> In the present case, the Administrative Law Judge finds that the record fails to evidence that the claimant's emotional/mental impairment would impose more than minimal effect on his ability to perform work related activities and would accordingly, be non-severe. To extent the record of the claimant's mental health care

94

contains reference to no clinical findings, it is observed, he, during the period of disability, did demonstrate cognitive and social functioning sufficient for attendance at school. The claimant's ability to engage in this activity tends to suggest a level of functioning converse to a finding of severe impairment (Tr. 25).

In summary, the medical evidence establishes that the claimant has the following "severe" impairments: Coronary heart disease, diabetes, history of lower extremity edema, history of onychomycosis of the left hallux, degenerative change of the lumbar spine, and sleep apnea. The record does not contain medical findings obtained on clinical examination or special study which are the same as or equal to any of those listed in any subsection of the Listing of Impairments (Tr. 25).

The Administrative Law Judge places no weight on the January 9, 2001, statement of Dr. Wanda K. Holloway, which indicates the claimant to be unemployable (Exhibit BSE, p. 1). As basis for her opinion, Dr. Holloway has included reference to multiple physical ailments of the claimant. The record, however, fails to evidence that Dr. Holloway treated the claimant relative to any of his physical ailments and, accordingly, her statement is overreaching. Further, statements that a claimant could not be gainfully employed are not medical opinions but rather opinions on the application of Social Security statutes, a task assigned solely to the discretion of the Commissioner. Such statements are not conclusive as to the ultimate question of disability. Furthermore, the Administrative Law Judge notes that Dr. Holloway's statement is insufficiently explained in that it fails to quantify the manner in which the claimant's impairments have impeded his ability to function (Tr. 26-27).

The Administrative Law Judge evaluated plaintiff's

credibility as follows:

95

In evaluating the credibility of the claimant's allegations, applicable policy, regulations, and case law (such as Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) requirements were considered as delineated below: Objective medical evidence; the nature, location, onset, duration, frequency, radiation, and intensity of any pain; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side effects of any pain medication; treatment, other than medication for relief of pain; functional restrictions; the claimant's daily activities; any measures the claimant uses or has used to relieve pain or other symptoms; and the claimant's prior work record.

Due to his physical impairments, the claimant has reported he experiences chronic pain localized to the back, left knee, right elbow and right hand; swelling of the hands and feet; shortness of breath on exertion; and frequent fatigue (Exhibit 134E, Pgs. 2-6). Notwith-standing the aforementioned subjective reporting of symptoms, the Administrative Law Judge finds significant statements of the claimant which indicate that he, during his claimed period of disability, has retained the residual capacity necessary to prepare simple meals, do some household maintenance (dishes, laundry), shop for essentials, work on the computer, and attend class (Exhibit 134E, Pgs. 2-3). While not dispositive, the claimant's ability to engage in the aforementioned activities, albeit in a reportedly limited capacity, tends to indicate a residual capacity at odds with a finding of disabling limitation. Also inconsistent with a finding of disability is the relative lack of clinically significant findings on consultative examination of March 7, 2001, said findings as heretofore discussed. Although it would be inappropriate to assess a claimant's level of functioning on basis of one point in time, numerous breaks in the claimant's pursuit of medical care also tend to suggest tolerable symptomatology. With respect to his allegations of disability due to seizure activity, the record fails to identify any ongoing pursuit of medical care. With respect to his allegations of disability due to cardiovascular impairment, review of the relevant medical record fails to establish ongoing pursuit of care from an accepted

96

medical source during the period October 2001 through
April 7, 2002; and for the period subsequent to April
2002. With respect to his allegations of disability due
to problems with his feet, review of the relevant
medical record fails to establish ongoing pursuit of
care from an accepted medical source during the period
February 24, 2001, through January 31, 2002; and for
the period subsequent to June 2002. With respect to his
allegations of disability due to musculoskeletal
impairment, review of the relevant record fails to
establish ongoing pursuit of care from an accepted
medical source both previous to December 2002 and
subsequent to January 2003. The claimant's failure,
particularly, during a claimed period of disability, to
more diligently seek treatment relative to these
impairments tends to be inconsistent with a finding for
disability.

The Administrative Law Judge has reviewed the
claimant's prior work record, for the relevant past 15
years, to ascertain whether it provides credence to the
claimant's allegation that his impairments have
prevented him from engaging in competitive employment.
This review has revealed that the claimant has had
either nominal or no earnings in all but three of the
years relevant to this decision (Exhibit B4D, p. 1).
The Administrative Law Judge finds that the claimant's
poor work history detracts from a finding that
disability was the cause of his not working (Tr. 26).

After carefully considering all the evidence of the
record, the Administrative Law Judge finds the
claimant's subjective complaints to not be fully
credible. Though the claimant's impairments may create
certain pain and discomfort, the record as a whole does
not support a finding that the claimant's impairments
are as limiting as he alleges.

(Tr. 27).

   The Administrative Law Judge made the following

findings:

Case 6:04-cv-03461-REL   Document 21   Filed 03/31/06   Page 97 of 120

1. The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

2. The claimant met the disability insured status requirements of the Act on September 11, 2000, the date he alleges he became disabled, and continues to meet them at least through the date of this decision.

3. The medical evidence establishes that the claimant has the following medically determinable "severe" impairments: Coronary heart disease, diabetes, history of lower extremity edema, history of onychomycosis of the left hallux, degenerative change of the lumbar spine, and sleep apnea.

4. The claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

5. The claimant's allegations of total inability to work were not fully credible because of significant inconsistencies in the record as a whole, as discussed more fully in the Evaluation of the Evidence.

6. The claimant has the residual functional capacity to lift and/or carry 10 pounds, both occasionally and frequently; sit (with usual breaks) for about 6 hours in an 8 hour workday; stand and/or walk (with usual breaks) for about 2 hours in an 8 hour workday; and is unlimited in his ability to push and/or pull. The residual functional capacity determined by the Administrative Law Judge herein coincides with the exertional capacity to perform the full range of sedentary exertional work.

7. The claimant is 51 years of age, which is defined as a person closely approaching advanced age (20 CFR 404.1563 and 416.963). Previous to the claimant's fiftieth birthday on January 20, 2002, the claimant would have been classified as a younger individual.

8.  The claimant has a high school or better education, having completed the twelfth grade.

9.  The claimant's past relevant work required the performance of work related activities precluded by the above limitations (20 CFR 404.1565 and 416.965).

10. Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, Vocational Rules 201.16 and 201.21 of Table No. 1, Appendix 2, Subpart P, Regulations No. 4, directs a conclusion of "not disabled."

11. The claimant is not under a "disability," as defined in the Social Security Act (20 CFR 404.1520(f) and 416.920(f).

(Tr. 28-29).

## VI. FINDINGS OF THE APPEALS COUNCIL

The decision of the Appeals Council is dated August 20, 2004, and denied plaintiff's claim (Tr. 7-9). The Council found:

In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

(Tr. 7-8).

## VII. ANALYSIS

### A.  ARE PLAINTIFF'S MENTAL IMPAIRMENTS SEVERE?

The first issue raised is whether plaintiff's mental impairments are severe.

99

Plaintiff argues that the ALJ failed to consider the medical source statement-mental prepared by Dr. Garcia dated June 14, 2000, in which the doctor found plaintiff moderately limited in some mental capacities and markedly limited in other dealing with his capacity to work without interruption from psychological symptoms.  Plaintiff points out that this source statement was prepared just months before plaintiff's alleged onset date and is somewhat corroborated by the Southwest Missouri State University letter to plaintiff indicating that the school would not tolerate "any uncivil or disruptive behavior" (Tr. 151).

In response, the defendant observes that a severe impairment is one that significantly limits plaintiff's physical or mental ability to perform basic work activities, which include among other things the ability to use judgment, respond appropriately to supervisors, co-workers, and usual work situations.  Defendant argues that the ALJ properly evaluated plaintiff's mental impairment in four categories, concluding that plaintiff had no restrictions on daily activities, mild restriction on social functioning, and had not experienced any repeated episodes of decompensation.  Concerning the June 14, 2000, medical source statement, defendant observes that it was completed

100

before plaintiff's onset date and covered a period of time when plaintiff was ruled not disabled.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Ellis v. Barnhart</u>, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) – (5).

In this case, plaintiff testified that Dr. Garcia had been his psychiatrist since January 2000. However, there are no medical records from Dr. Garcia, only two medical source statements, one dated June 14, 2000, and one dated December 20, 20002. The ALJ discounted the opinion of Dr.

Garcia because "[t]he record fails to evidence that Dr. Garcia has examined the claimant on any occasion since his alleged onset date of disability of September 11, 2000." (Tr. 25).

**Length of the Treatment Relationship**

Although plaintiff testified in December 2002 that he was treated by Dr. Garcia since January 2000, or almost three years, there are no treatment notes in the record. On October 30, 2001, Dr. Trygg noted that plaintiff "will reestablish with the psychiatrist, Dr. Garcia, but an appointment cannot be arranged until the end of December." Clearly plaintiff was not being treated by Dr. Garcia in October 2001.

Because there is no evidence that defendant was actually treated by Dr. Garcia, the length of the treatment relationship has little weight.

**Frequency of Examinations**

As discussed above, there is no evidence in this record that Dr. Garcia conducted regular examinations of plaintiff. The only records provided by Dr. Garcia are the two Medical Source Statements at issue.

**Nature and Extent of the Treatment Relationship**

Again, because no evidence of treatment, examinations, or testing appears in this record, that nature and extent of the treatment relationship appears to be tenuous.

**Supportability by Medical Signs and Laboratory Findings**

Dr. Garcia provided no support for the opinions he listed in his June 14, 2000, assessment (Tr. 282-283). Likewise, he provided no support for the opinions listed in his December 30, 2002, assessment (Tr. 710-712). In addition to providing no support for his opinions on the Medical Source Statement forms, there are no treatment notes by Dr. Garcia by which to infer that he relied on any medical signs or laboratory findings.

**Consistency of the Opinion with the Record as a Whole**

Plaintiff's worst mental condition occurred years before his alleged onset date. He was assessed with a GAF of 25 to 30 on January 14, 1995. He was assessed with a GAF of 55 on August 25, 1999. He was assessed with a GAF of 75 to 80 on December 13, 1999, less than one year prior to his alleged onset date. A GAF of 75 to 80 means no more than a slight impairment.

Lester Bland, Psy.D., found on March 28, 2001 (during plaintiff's alleged treatment by Dr. Garcia) that plaintiff's mental impairment was not severe.  In support of that finding, Dr. Bland noted that on September 23, 1999, plaintiff told Dr. Anderson that he experience intermittent depression for the past two years,

> apparently having improved with depression in recent months, having few depressive symptoms.  Memory functions and mental control were adequate, being estimated to be functioning in the average range of intelligence.  He was able to understand and remember instructions adequately.  His ability to sustain concentration, persistence, and pace was adequate for probably moderately complex tasks.  His social interactions were adequate.  His ability to adapt to environmental changes in a safe manner was adequate.
>
> Claimant has attended classes full time at SMSU since 12/99, medical evidence in file does not indicate claimant's symptoms have worsened.  Dr. Holloway Psy.D. at Burrell completed third party activities of daily living; however, her statement re: claimant's employment were because of physical impairments not psychiatric.  Claimant's functioning is not limited because of depression and is therefore considered not severe.

(Tr. 314).

Based on this evidence, I find that the opinions expressed by Dr. Garcia in his Medical Source Statements are contradicted by the other evidence in the record.  I also find that the ALJ properly discounted the opinions of Dr. Garcia.

104

An impairment is "non-severe" if it has no more than a minimal impact on an individual's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a) and 416.921(a); Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989). An impairment may be found "not severe" only if the impairment is so slight that it is unlikely the person would be found disabled even if her age, education, and experience were taken into account. Bowen v. Yuckert, 482 U.S. 137, 153 (1987). "Basic work activities" include mental capacities for understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b)(3)-(6) and 416.921(b)(3)-(6).

The substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's mental impairment is not severe. Plaintiff was assessed with a GAF of 75 to 80 less than one year before his alleged onset date. He was found by Dr. Bland to have a non-severe mental impairment. He was able to achieve passing grades while attending college full time. Dr. Garcia's unsupported Medical Source Statements do not call this other evidence

105

into doubt and do not support a finding that plaintiff's mental impairment is severe.

## 2. IS PLAINTIFF'S CONGESTIVE HEART FAILURE A SEVERE IMPAIRMENT?

The second issue is whether plaintiff's congestive heart failure amounts to a severe impairment.

The Code of Federal Regulations sets out the requirements for finding that an impairment is severe: 20 C.F.R. § 404.1520(a)(4)(ii) states, "At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled." Further, 20 C.F.R. § 404.1520(c) states, "You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. . . ."

To determine what constitutes a severe impairment, we look to 20 C.F.R. § 404.1521:

What we mean by an impairment(s) that is not severe.

106

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

Plaintiff argues that the ALJ found plaintiff to have a number of severe impairments (e.g., coronary artery disease, diabetes, lower extremity edema, onychomysosis of the left hallux, degenerative changes in the lumbar spine and sleep apnea) but failed to find plaintiff's congestive heart failure to be a severe impairment. Plaintiff argues that his treating physician, Kelly Trigg, M.D., diagnosed him with the condition and a consulting physician confirmed the

107

severity of this condition.[27]

Defendant, in response, argues that the ALJ analyzed plaintiff's heart impairments, observed that his cardiac condition was essentially normal after stent placement, and concluded that plaintiff's lower extremity edema, although severe, was not consistently severe.

A review of the medical records shows plaintiff seeking relief for symptoms associated with coronary problems, but no evidence that the problem is severe. For example:

> A February 14, 2000, report from St. John's states, "There are no reversible/ischemic changes to suggest critically obstructed coronary disease. Myocardial distribution of tracer is physiologic suggesting viability throughout. There is normal regional and global left ventricular systolic function."

> A December 18, 2000, report from St. John's states, "There are no reversible/ischemic changes to suggest myocardium at risk or critically obstructed coronary disease. Findings are unchanged since the previous study. Normal regional and global left ventricular systolic function. Findings in the inferior wall most likely reflect anatomic attenuation in light of no history of myocardial injury."

> A September 18, 2001, report from St. John's states, "Very mild reversible/ischemic changes are present in

---

[27]The consultant, Dr. Charles J. Ash, M.D., F.A.C.S., A.A.O.S., on March 7, 2001, made the following notation with regard to plaintiff's heart: "Normal sinus rhythm.  No murmurs" (Tr. 298).  The doctor diagnosed plaintiff as suffering from generalized degenerative arthritis; severe hypertensive cardiovascular disease; diabetes; and depression (Tr. 299).

Case 6:04-cv-03461-REL   Document 21   Filed 03/31/06   Page 108 of 120

the inferoapical area of questionable clinical significance and not substantially changed in comparison to the previous examination. Global left ventricular systolic function is similar to that noted on the previous study of 12/18/00."

An April 17, 2002, report from St. John's Cardiovascular Specialists states, "There is no obvious evidence for a critical coronary artery stenotic lesion leading to reversible ischemia on this examination. There is normal wall motion and left ventricular ejection fraction at rest."

A July 21, 2003, report from St. John's states, "There was no obvious evidence for a critical coronary artery stenotic lesion leading to reversible ischemia on this examination. There is normal wall motion and left ventricular ejection fraction at rest. The previous examination of 4/17/02 demonstrated virtually identical imaging findings. The LVEF [left ventricular ejection fraction] on the previous examination was 64% [with normal being 55]."

The medical records simply do not support a finding that plaintiff's heart problems are severe. There is no evidence in the record that plaintiff's heart condition limited his ability to walk, stand, sit, lift, push, pull, reach, carry, handle, see, hear, speak, understand simple instructions, carry out simple instructions, remember simple instructions, respond appropriately to supervision, response appropriately to co-workers and usual work situations, use judgment, or deal with changes in a routine work setting. Therefore, the evidence and the law support the ALJ's finding that plaintiff's cardiac problems are not severe.

109

## 3. ARE PLAINTIFF'S COMBINED IMPAIRMENTS SEVERE UNDER THE CODE?

The third issue is whether plaintiff's combined impairments amount to a severe impairment under Title 20 of the Code of Federal Regulations, Section 404.1526(a).

Plaintiff argues that his combined medical conditions under the Code of Federal Regulations are equivalent to the listed impairments in severity and duration. Included among the combined impairments, plaintiff lists: mental health problems, congestive heart failure, hypertension, left knee pathology, obesity, musculoskeletal impairments in the knee and spine, coronary artery disease, edema, diabetes, and sleep apnea.

Defendant responds by pointing out that under Listing 1.02, plaintiff must show that the combination of impairments prevents plaintiff from ambulating effectively, which is not reflected in the medical records; that under Listing 1.04, plaintiff must show that a disorder of the spine must be combined with evidence of nerve root compression, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, and positive straight leg raising test, all of which is not supported by the medical records; that under Listing 1.04, dealing with heart

110

disease and coronary artery disease, plaintiff must show angiographic evidence and marked limitation of physical activity, which is not evident in the medical records; and under a Listing, plaintiff must show that his obesity and diabetes equal a Listing, but there is no specific evidence that his obesity or diabetes has produced medical findings equivalent to the Listing 1.02, 1.04, or 4.04.

To properly evaluate this issue, one must look at each impairment to see whether there is evidence of severity and then evaluate all the impairments together to determine whether they are equivalent to "severe."

As to the mental health and heart impairments, I have already concluded that they are not severe based on my review of the medical records.

I have reviewed the entire stipulated record and find that although there are many instances in which plaintiff has complained of a condition, the medical findings do not supported the condition or its severity. For example:

> On July 29, 2003, plaintiff went to the emergency room complaining of difficulty breathing. He was in no apparent distress, his respiration was even and unlabored, a chest x-ray was normal, and he was sent home with a diagnosis of sleep apnea and told to use his CPAP machine at night (Tr. 815-817).

> On January 22, 2003, Curt Evenson, M.D., observed that plaintiff's back x-rays did not show "any significant

111

degeneration," and other than "a little bit of L3-4 degenerative disc disease, otherwise, everything else looks pretty benign" (Tr. 716).

On December 26, 2002, plaintiff went to see Curt Evenson, M.D., complaining of lower back pain. The doctor observed:

> No abnormal curvatures. No stepoffs are palpated. He has no apparent increase in muscular tension. He can flex forward full with ease. Extension does not create pain.

The doctor observed some tenderness over the right sacroiliac joint over the aspect of it, mild swelling in the feet, and distal hypoesthesia in the feet (Tr. 719-720).

There is no evidence in the record that plaintiff's obesity caused any problems, that his hypertension caused him any limitations, that his left knee caused him any limitations of function, that his edema caused any limitations of function, or that his sleep apnea caused any limitations of function. I note here also that the record establishes that plaintiff was prescribed a CPAP machine which he did not use, he was told to adhere to a strict diet which he did not, and he was prescribed medication that he did not take. When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application

112

for benefits. Id.; 20 C.F.R. § 416.930(b).

Based on these and the other medical records in the file, the ALJ did not err by finding that plaintiff's combined impairments are not severe as defined by the Code.

### 4. DID THE ALJ ERR IN EVALUATING PLAINTIFF'S CREDIBILITY?

In his fourth issue, plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible, and defendant responds that the ALJ properly evaluated plaintiff's credibility.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d at 1322. The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported

113

by substantial evidence on the record as a whole. <u>Robinson</u> <u>v. Sullivan</u>, 956 F.2d at 841.

**a.   PRIOR WORK RECORD**

As to his work record, the ALJ found that for the relevant 15-year period, plaintiff had nominal or no earnings in all but three years relevant to the decision, and concluded that this factor weighed against plaintiff's credibility (Tr. 26).

My review of the work record shows that plaintiff has been employed sporadically and his income has been erratic. Therefore, I do not find that the ALJ erred in reaching his conclusion here.

**b.   DAILY ACTIVITIES**

As to plaintiff's daily activities, the ALJ found that plaintiff had the residual physical capacity to prepare simple meals, do household maintenance, shop for essentials, work on a computer, and attend school, making passing grades.  The ALJ concluded that these activities are inconsistent with a disabling condition.  I agree, and therefore find that this factor supports the ALJ's decision.

**c.   DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS**

As to plaintiff's symptoms, the ALJ observed that "numerous breaks in the claimant's pursuit of medical care

114

also tend to suggest tolerable symptomatology" (Tr. 26).  As to plaintiff's specific allegations, the ALJ noted that:

> As to seizure activity, the record fails to show any pursuit of medical treatment;
>
> On cardiovascular problems, the record fails to show the ongoing pursuit of care during the period of October 2001 to April 2002, and for the period post June 2002;
>
> As to his feet, the record fails to show consistent pursuit of treatment from February 24, 2001, to January 31, 2002, and the period post June 2002; and
>
> As to musculoskeletal impairment, the record shows no consistent pursuit of treatment before December 2002 and after January 2003.

(Tr. 26).

In addition to these problems, my review of the medical records-as discussed earlier-often demonstrates a lack of concrete medical findings substantiating plaintiff's complaints.  Therefore, I find no error with the ALJ's decision on this factor.

**d.   PRECIPITATING AND AGGRAVATING FACTORS**

I find no discussion of precipitating or aggravating factors in the decision or the briefs of either party, and therefore conclude that it has no application here.

**e.   DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION**

Neither the ALJ nor the parties address medication in connection with the credibility analysis.

From my review of the medical records, there is nothing to indicate that medication presented any significant problem for plaintiff.  He did experience problems with his blood sugar levels, but these seem to be caused, at least in part, by plaintiff's failure to be compliant with his diet and check his blood sugars at home (Tr. 482, 492, 523, 566).  On April 14, 2000, plaintiff reported no side effects from the Prandin and Glucophage. His December 31, 2001, medical records show that he was tolerating Glucovance well.  The most recent entry by his doctors shows "Diabetes, Mellitus, Type 2, controlled" (Tr. 742).

This factor supports the ALJ's credibility conclusion.

## f.   FUNCTIONAL RESTRICTIONS

There are no restrictions in the record, beyond restrictions for a few days, on plaintiff's ability to stand, walk, sit, lift, reach, or any other physical limitations.  Dr. Ash observed plaintiff walking, getting on and off the examining table, etc., with no physical difficulties.  Dr. Hawkins limited plaintiff from lifting more than 20 pounds for three days (which is twice the amount in the ALJ's residual functional capacity finding).  There are no other instances of doctors limiting plaintiff's functional activities.

### g.    CREDIBILITY CONCLUSION

Based on my review of the record as a whole, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit plaintiff's subjective complaints of disability.

### 5.    *DID THE ALJ PROPERLY WEIGH THE OPINIONS OF PLAINTIFF'S PHYSICIANS ON RESIDUAL FUNCTIONAL CAPACITY?*

In his fifth issue, plaintiff argues that the ALJ did not properly evaluate the evidence presented by plaintiff's treating physicians when deciding plaintiff's residual functional capacity.  However, plaintiff fails to point to any such evidence in the record which the ALJ is accused of ignoring.  As the defendant points out, the ALJ did consider the findings of Charles J. Ash, M.D., a consulting physician, and the judge's finding on residual functional capacity are consistent with those opined by Dr. Ash (Tr. 298-299).  I find no error here.

### 6.    *SHOULD THE CASE BE REMANDED BASED ON NEW EVIDENCE?*

In his sixth and final issue, plaintiff argues that new medical information justifies a remand to the ALJ for further consideration.  Plaintiff attaches a report of lumbar spine MRI dated October 15, 2004 (Exhibit A) and an independent medical evaluation by Shane L. Bennoch, M.D.

117

dated October 8, 2004 (Exhibit B).

In response, defendant points out that the evidence, even if relevant to plaintiff's conditions, postdates by 13 to 14 months the ALJ's decision and therefore is immaterial to the time period in question.

The decisional law is clear that a remand is appropriate only when there is a showing that the new evidence is material and for which there is good cause shown for plaintiff's failure to include it in the record before the administrative agency, and implicit in such a finding is that the evidence relate to the time period for which the benefits were sought. <u>Jones v. Callahan</u>, 122 F.3d 1148, 1154 (8th Cir. 1997); <u>Goad v. Shalala</u>, 7 F.3d 1397, 1398-99 (8th Cir. 1993).

The MRI report is dated October 20, 2004, and deals with plaintiff's low back pain as of October 15, 2004. Since the information postdates the ALJ's decision and the Appeals Council's review, it is immaterial to the issues in this litigation.

The independent medical examination by Shane L. Bennoch, M.D., is dated October 8, 2004, and claims to deal with an injury alleged to have occurred on June 1, 1998, within the time frame covered by this litigation. However,

118

the report observes that plaintiff's "current back pain and obvious spasm is secondary to the motor vehicle accident in June 2004" when he was rear-ended (Attachment B, page 13). In addition, the doctor's functional restrictions obviously are related to and are effective as of the date of examination, September 9, 2004. Because this information has limited application to the review of the ALJ's decision and because there has been no showing of good cause as to why plaintiff failed to have such an independent medical examination performed before the resolution of his administrative action, the report is not material to this litigation.

Based on the above findings, I decline to remand this case to the ALJ for consideration of the new evidence contained in Exhibits A and B.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

119

ORDERED that the decision of the Commissioner is

affirmed.


_/s/_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 31, 2006

Case 6:04-cv-03461-REL   Document 21   Filed 03/31/06   Page 120 of 120